**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mark Douglas POEHLMAN,
Defendant–Appellant.**

No. 98–50631.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 6, 1999

Filed June 27, 2000

---

Edward M. Robinson, Torrance, California, argued the cause for the defendant-appellant.

Luis Li, Assistant United States Attorney, Los Angeles, California, argued the cause for the plaintiff-appellee. With him on the briefs were Alejandro N. Mayorkas and George S. Cardona.

Before: FLETCHER, KOZINSKI and THOMPSON, Circuit Judges.

Opinion by KOZINSKI; Dissent by Judge THOMPSON.

KOZINSKI, Circuit Judge.

Mark Poehlman, a cross-dresser and foot-fetishist, sought the company of like-minded adults on the Internet. What he found, instead, were federal agents looking to catch child molesters. We consider whether the government's actions amount to entrapment.

I

After graduating from high school, Mark Poehlman joined the Air Force, where he remained for nearly 17 years. Eventually, he got married and had two children.

When Poehlman admitted to his wife that he couldn't control his compulsion to cross-dress, she divorced him. So did the Air Force, which forced him into early retirement, albeit with an honorable discharge.

These events left Poehlman lonely and depressed. He began trawling Internet "alternative lifestyle" discussion groups in an effort to find a suitable companion. Unfortunately, the women who frequented these groups were less accepting than he had hoped. After they learned of Poehlman's proclivities, several retorted with strong rebukes. One even recommended that Poehlman kill himself. Evidently, life in the HOV lane of the information superhighway is not as fast as one might have suspected.

Eventually, Poehlman got a positive reaction from a woman named Sharon. Poehlman started his correspondence with Sharon when he responded to an ad in which she indicated that she was looking for someone who understood her family's "unique needs" and preferred servicemen. Poehlman answered the ad and indicated that he "was looking for a long-term relationship leading to marriage," "didn't mind children," and "had unique needs too." Reporter's Transcript of Proceedings, *United States v. Poehlman*, No. CR 97–1008–SWK, Thurs., May 21, 1998 at 26 (Testimony of Mark Poehlman).[1]

Sharon responded positively to Poehlman's e-mail. She said she had three children and was "looking for someone who understands us and does not let society's views stand in the way." She confessed that there were "some things I'm just not equipped to teach [the children]" and indicated that she wanted "someone to help with their special education." The full text of her first responsive e-mail[2] is set out in

1. The government was unable to produce the text of the original e-mail at trial, but Poehlman offered undisputed testimony as to its substance.

2. Much of the evidence in this case is in the form of e-mail messages sent back and forth between Sharon and Poehlman. In the breezy, informal style of e-mail, there are numerous grammatical, spelling and syntax errors in the messages. Because indicating each mistake with a [sic] would be too distracting, and correcting all of the errors poses the risk of altering the meaning of the mes-

the margin.[3]

In his next e-mail, also set out in the margin,[4] Poehlman disclosed the specifics of his "unique needs." He also explained that he has strong family values and would treat Sharon's children as his own. Sharon's next e-mail focused on the children, explaining to Poehlman that she was looking for a "special man teacher" for them but not for herself. She closed her e-mail with the valediction, "If you understand and are interested, please write back. If you don't share my views I understand.

> sages, we reproduce the messages in their original form, warts and all.

**3.** Thanks for answering my posting. I got a lot of responses, but for some reason yours caught my eye.

> I'll tell you a little about myself. I'm 30, divorced and have 3 children. We are a very close family. I'm looking for someone who understands us and does not let society's views stand in the way. I've had to be both mother and father to my sweethearts, but there are some things I'm just not equipped to teach them. I'm looking for someone to help with their special education.
> If you have an interest, I'd love to hear your ideas, desires and experiences. If this doesn't interest you, I understand.

Appellant's Excerpts of Record at Tab 5 (July 27, 1995).

**4.** Hi There, talk about a pleasant surprise to see a answer from you, I too am divorced and have two boys not living with me they are 9 and 6. they live with their mother in upper N.Y. I don't get to see them very often matter of fact its been almost two years since last I saw them, I am planning a trip to see them now.

> I am retired Air Force after 16.8 years I took the early retirement, decided it was time to get out and work for a living again..(g) I am extremely honest and straight forward type of guy I don't play head games and don't like to have them played against me. I tell you straight out and open that I am a in house tv, meaning I rather enjoy wearing hose and heels inside the house, not around small children of course but when mine are old enough to understand I will tell them that and the big foot fetish I have are about my only two major problems that need a open minded easy going woman, so as they say in the movies if you don't mind me wearing your hose and licking your toes then I am open

Thanks again for your last letter." Appellant's Excerpts of Record at Tab 5 (Aug. 1, 1995).

Poehlman replied by expressing uncertainty as to what Sharon meant by special man teacher. He noted that he would teach the children "proper morals and give support to them where it is needed," *id.* (Aug. 2, 1995), and he reiterated his interest in Sharon.[5]

Sharon again rebuffed Poehlman's interest in her: "One thing I should make

> for anything..(g),, I also have a sense of humor. as far as your children are concerned I will treat them as my own (as I would treat my boys if I had them with me) I have huge family values and like kids and they seem to like me alright too. well now you know all about me, if you are still interested then please write back, if not and I would understand why you didn't then I wish you all the best in finding the person you are looking for. if you wish to call my number is 904–581–5442, I am not home a lot due to work and school but there is an answering machine that only I listen to, ( I you didn't th live alone) have a nice day. Mark

Appellant's Excerpt of Record at Tab 5 (July 31, 1995).

**5.** Hi Sharon,

> so happy to finnally learn your name, I am interested in being this special teasher, but in all honesty I really don't know exactly what you expect me to teach them other than proper morals and give support to them where it is needed.
> Can I ask how old your sweethearts are and if you don't mind telling me what kind of teachings do you expect me to give them? But I will tell you that I am interested in their mom too, you would be part of the picture with them right? this is why I tell you all about myself and what I like, cause I ahve to be honest and tell you I would hope you would support and enjoy me sexually as well as in company and hopefully love and the sexual relations that go with it.
> Hope you are well and your sweethearts are well too, I truly hope to hear from you and hopefully some more information about what you are looking for.. till then Have a very nice day. Mark

Appellant's Excerpts of Record at Tab 5 (Aug. 2, 1995).

really clear though, is that there can't be anything between me and my sweethearts special teacher." *Id.* (Aug. 2, 1995). She then asked Poehlman for a description of what he would teach her children as a first lesson, promising "not to get mad or upset at anything written. If I disagree with something I'll just say so. I do like to watch, though. I hope you don't think I'm too weird." *Id.*

Poehlman finally got the hint and expressed his willingness to play sex instructor to Sharon's children.[6] In later e-mails, Poehlman graphically detailed his ideas to Sharon, usually at her prompting. Among these ideas were oral sex, anal sex and various acts too tasteless to mention. The correspondence blossomed to include a phone call from Sharon and hand written notes from one of her children. Poehlman made decorative belts for all the girls and shipped the gifts to them for Christmas.

Poehlman and Sharon eventually made plans for him to travel to California from his Florida home. After arriving in California, Poehlman proceeded to a hotel room where he met Sharon in person. She offered him some pornographic magazines featuring children, which he accepted and examined. He commented that he had always looked at little girls. Sharon also showed Poehlman photos of her children: Karen, aged 7, Bonnie, aged 10, and Abby, aged 12. She then directed Poehlman to the adjoining room, where he was to meet the children, presumably to give them their first lesson under their mother's protective supervision. Upon entering the room however, Poehlman was greeted by Naval Criminal Investigation Special Agents, FBI agents and Los Angeles County Sheriff's Deputies.

Poehlman was arrested and charged with attempted lewd acts with a minor in violation of California law. He was tried, convicted and sentenced to a year in state prison. Two years after his release, Poehlman was again arrested and charged with federal crimes arising from the same incident. A jury convicted him of crossing state lines for the purpose of engaging in sex acts with a minor in violation of 18 U.S.C. § 2423(b). He was sentenced to 121 months. Poehlman challenges the conviction on the grounds that it violates double jeopardy and that he was entrapped. Because we find there was entrapment, we need not address double jeopardy.

## II

"In their zeal to enforce the law ... Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). On the other hand, "the fact that officers or employees of the Government merely afford opportunity or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932). The defense of entrapment seeks to reconcile these two, somewhat contradictory, principles.

When entrapment is properly raised, the trier of fact must answer two related questions: First, did government agents induce the defendant to commit the crime? And, second, was the defendant predisposed? We discuss inducement at greater length below, *see* page 698 *infra,*

---

**6.** I am very open minded and willing to teach them everything you wish taught.

 If they are all girls then I would help them to learn how to protect themselves by taking control over men I can be very submissive to the right women, though they will learn the right way to dress least in the house, you would be expected to dress as them also and prove to be a good example for them or face punishment.

Appellant's Excerpts of Record at Tab 5 (Aug. 3, 1995).

but at bottom the government induces a crime when it creates a special incentive for the defendant to commit the crime. This incentive can consist of anything that materially alters the balance of risks and rewards bearing on defendant's decision whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct. Even if the government induces the crime, however, defendant can still be convicted if the trier of fact determines that he was predisposed to commit the offense. Predisposition, which we also discuss at length below, *see* page 703 *infra*, is the defendant's willingness to commit the offense *prior* to being contacted by government agents, coupled with the wherewithal to do so. *See United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir.1994) (en banc). While our cases treat inducement and predisposition as separate inquiries, *see, e.g., United States v. McClelland*, 72 F.3d 717, 722 (9th Cir.1995), the two are obviously related: If a defendant is predisposed to commit the offense, he will require little or no inducement to do so; conversely, if the government must work hard to induce a defendant to commit the offense, it is far less likely that he was predisposed. *See Hollingsworth*, 27 F.3d at 1200.

 To raise entrapment, defendant need only point to evidence from which a rational jury could find that he was induced to commit the crime but was not otherwise predisposed to do so. *See United States v. Staufer*, 38 F.3d 1103, 1108 (9th Cir.1994). Defendant need not present the evidence himself; he can point to such evidence in the government's case-in-chief, or extract it from cross-examination of the government's witnesses. The burden then shifts to the government to prove beyond a reasonable doubt that defendant was *not* entrapped. *See Jacobson*, 503 U.S. at 549, 112 S.Ct. 1535.

 The district court properly determined that the government was required to prove that Poehlman was not entrapped and gave an appropriate instruction. The jury nonetheless convicted Poehlman, which means that either it did not find that the government induced him, or did find that Poehlman was predisposed to commit the crime.[7] Poehlman argues that he was entrapped as a matter of law. To succeed, he must persuade us that, viewing the evidence in the light most favorable to the government, no reasonable jury could have found in favor of the government as to inducement or lack of predisposition. *See United States v. Thickstun*, 110 F.3d 1394, 1396 (9th Cir. 1997).

### Inducement

 "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir.1994). Poehlman argues that he was induced by government agents who used friendship, sympathy and psychological pressure to "beguile[ ] him into committing crimes which he otherwise would not have attempted." *Sherman v. United States*, 356 U.S. 369, 376, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

According to Poehlman, before he started corresponding with Sharon, he was harmlessly cruising the Internet looking for an adult relationship; the idea of sex with children had not entered his mind. When he answered Sharon's ad, he clearly expressed an interest in "a long-term relationship leading to marriage." Testimony

---

**7.** Without a special verdict, we don't know which is the case. Because the determination of whether a defendant is entrapped is often confusing and difficult, we encourage district courts to use special verdict forms that query jurors as to the elements of the entrapment defense. Not only does this ease the process of appellate review, it encourages juries to focus their deliberations on the elements of the defense.

of Mark Poehlman, page 695 *supra.* His only reference to children was that he "didn't mind" them. *Id.* Even after Sharon gave him an opening by hinting about "not let[ting] society's views stand in the way," Poehlman continued to focus his sexual attentions on the mother and not the daughters: "[I]f you don't mind me wearing your hose and licking your toes then I am open for anything." Appellant's Excerpts of Record at Tab 5 (July 31, 1995).

It was Sharon who first suggested that Poehlman develop a relationship with her daughters: "I've had to be both mother and father to my sweethearts, but there are some things I'm just not equipped to teach them. I'm looking for someone to help with their special education." *Id.* (July 27, 1995). Poehlman's response to this ambiguous invitation was perfectly appropriate: "[A]s far as your children are concerned I will treat them as my own (as I would treat my boys if I had them with me) I have huge family values and like kids and they seem to like me alright too." *Id.* (July 31, 1995). Even when Sharon, in her next e-mail, became more insistent about having Poehlman be a special man teacher to her daughters, he betrayed no interest in a sexual relationship with them: "I am interested in being this special teasher, but in all honesty I really don't know exactly what you expect me to teach them other than proper morals and give support to them where it is needed." *Id.* (Aug. 2, 1995).

In the same e-mail, Poehlman expressed a continued interest in an adult relationship with Sharon: "I have to be honest and tell you I would hope you would support and enjoy me sexually as well as in company and hopefully love and the sexual relations that go with it." *Id.* It was only after Sharon made it clear that agreeing to serve as sexual mentor to her daughters was a condition to any further communications between her and Poehlman that he agreed to play the role Sharon had in mind for him.

The government argues that it did not induce Poehlman because Sharon did not, in so many words, suggest he have sex with her daughters. But this is far too narrow a view of the matter. The clear implication of Sharon's messages is that this is precisely what she had in mind. Contributing to this impression is repeated use of the phrases "special teacher" and "man teacher," and her categorical rejection of Poehlman's suggestion that he would treat her daughters as his own children and teach them proper morals with a curt, "I don't think you understand." *Id.*

In case the references to a special man teacher were insufficient to convey the idea that she was looking for a sexual mentor for her daughters, Sharon also salted her correspondence with details that clearly carried sexual innuendo. In her second e-mail to Poehlman, she explained that she had "discussed finding a special man teacher with my sweethearts and you should see the look of joy and excitement on their faces. They are very excited about the prospect of finding such a teacher." *Id.* (Aug. 1, 1995). To round out the point, Sharon further explained that "I want my sweethearts to have the same special memories I have . . . . I've told them about my special teacher and the memories I have. I still get goosebumps thinking about it." *Id.* From Sharon's account, one does not get the impression that her own special teacher had given her lessons in basket weaving or croquet. Finally, Sharon's third e-mail to Poehlman clearly adds to the suggestion of a sexual encounter between him and her daughters when she states: "I do like to watch, though. I hope you don't think I'm too weird." *Id.* In light of Sharon's earlier statements, it's hard to escape the voyeuristic implications of this statement. After all, there would be nothing weird about having Sharon watch Poehlman engaged in normal father-daughter activities.

Sharon did not merely invite Poehlman to have a sexual relationship with her minor daughters, she made it a condition of

her own continued interest in him.[8] Sharon, moreover, pressured Poehlman to be explicit about his plans for teaching the girls: "Tell me more about how their first lesson will go. This will help me make my decision as to who their teacher will be." *Id.* (Sept. 19, 1995). The implication is that unless Poehlman came up with lesson plans that were sufficiently creative, Sharon would discard Poehlman and select a different mentor for her daughters.

Sharon eventually drew Poehlman into a protracted e-mail exchange which became increasingly intimate and sexually explicit. Approximately three weeks into the correspondence, Poehlman started signing off as Nancy, the name he adopts when dressing in women's clothes. Sharon promptly started using that name, offering an important symbol of acceptance and friendship. In the same e-mail, Sharon complained that Poehlman had neglected to discuss the education of her two younger girls. "I thought it curious that you did not mention Bonnie or Karen. Are they too young to start their educations? I don't want them to feel left out, but at the same time If you aren't comfortable with them please say so." *Id.* (Aug. 30, 1995).

Sharon also pushed Poehlman to be more explicit about his plans for the oldest daughter: "Abby is very curious (but excited) about what you expect her to do and I haven't been able to answer all her questions. Hope to hear from you soon." *Id.* Poehlman responded to Sharon's goading: "Bonnie and Karen being younger need to learn how to please, before they can be taught how to be pleased. they will start be exploring each others body together as well as mine and yours, they will learn how to please both men and women and they will be pleasein Abby as well." *Id.* (Aug. 31, 1995).

Over six months and scores of e-mails, Sharon persistently urged Poehlman to articulate his fantasies concerning the girls.[9] Meanwhile Poehlman continued his efforts to establish a relationship with Sharon. For example, Poehlman twice proposed marriage, but this drew a sharp rebuke from Sharon:

Nancy, I'm not interested in marriage or any type of relationship with my darlings' teacher. My quest as their mother is to find them the right teacher so that they get the same education I was

---

**8.** Sharon repeatedly held her own relationship with Poehlman hostage to his fulfilling the role of special man teacher. "I'm looking for someone to help with their special education .... If this doesn't interest you, I understand." Appellant's Excerpts of Record at Tab 5 (July 27, 1995). "If you understand and are interested, please write back. If you don't share my views I understand." *Id.* (Aug. 1, 1995). "I'd love to hear your ideas on lessons.... If you are still interested I'm looking forward to your next letter." *Id.* (Aug. 9, 1995). "If this is ok to you, please tell me so. If not, I wish you well and I'll continue my search." *Id.* (Sept. 18, 1995). "[I]f being their teacher is something you don't want to do[,] I will try to find another person like you to be their teacher." *Id.* (Dec. 13, 1995). Anytime Poehlman strays from the discussion of the daughters into a discussion of himself and Sharon, she refocuses him on the children. "[Y]our statement about wanting to be 'your friend and lover' ... was this directed at me or the girls? If it was to the girls, that's fine, but not for me. I hate to keep making a thing about this but I just want

you to know that there will be nothing sexual between us." *Id.* (Nov. 10, 1995).

**9.** "I'd love to hear your ideas, desires and experiences." Appellant's Excerpts of Record at Tab 5 (July 27, 1995). "The best way for me to judge who I'm going to choose to be their teacher is to see what he would have in mind for a first lesson. I promise not to get mad or upset at anything written." *Id.* (Aug. 2, 1995). "I'd love to hear your ideas on lessons...." *Id.* (Aug. 9, 1995). "Abby is interested in what exactly what a mistress is and what one does. I started to explain it to her but I thought it would mean more to her if you told her in your own words." *Id.* (Aug. 30, 1995). "Write back and let me know what you have in mind for the darlings." *Id.* (Sept. 7, 1995). "Tell me more about how their first lesson will go. This will help me make my decision as to who their teacher will be." *Id.* (Sept. 19, 1995). "I'd like to know a little bit more about what your lessons would consist of. That would answer a lot of questions for me and the girls." *Id.* (Nov. 2, 1995).

fortunate enough to get at their ages. You need to understand this. This is not for me, but for them. I don't mean to sound harsh, but you can't imagine the number of people just looking for a wife or girlfriend online. I have to look past all this and concentrate on finding my darlings' special man teacher.

*Id.* (Sept. 18, 1995). Poehlman nevertheless continued to seek a familial relationship with Sharon[10] and her daughters, expressing himself ready to quit his job and move across the country to be with them.

▮▮▮ As Justice Frankfurter noted in his concurrence in *Sherman,*

Of course in every case of this kind the intention that the particular crime be committed originates with the police, and without their inducement the crime would not have occurred. But it is perfectly clear [that] . . . where the police in effect simply furnished the opportunity for the commission of the crime, that this is not enough to enable the defendant to escape conviction.

*Sherman v. United States,* 356 U.S. 369, 382, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring). Whether the police did more than provide an opportunity—whether they actually induced the crime, as that term is used in our entrapment jurisprudence—depends on whether they employed some form of suasion that materially affected what Justice Frankfurter called the "self-struggle [to] resist ordinary temptations." *Id.* at 384, 78 S.Ct. 819 (Frankfurter, J., concurring).

▮▮▮ Where government agents merely make themselves available to participate in a criminal transaction, such as standing ready to buy or sell illegal drugs, they do not induce commission of the crime. "An improper 'inducement' . . . goes beyond providing an ordinary 'opportunity to commit a crime.' An 'inducement' consists of

an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Gendron,* 18 F.3d 955, 961 (1st Cir.1994) (quoting *Jacobson,* 503 U.S. at 550, 112 S.Ct. 1535).

In *Jacobson,* the government conceded inducement based on the fact that the defendant there committed the offense after numerous contacts from the government spanning over two years, during the course of which government agents "wav[ed] the banner of individual rights and disparag[ed] the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials." *Jacobson,* 503 U.S. at 552, 112 S.Ct. 1535. In doing so, "the Government not only excited petitioner's interest in sexually explicit materials banned by law but also exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and infringement of individual rights." *Id. Jacobson* is consistent with prior cases such as *Sherman,* where the government played upon defendant's weakness as a drug user, and *Sorrells,* where the government agent called upon defendant's loyalty to a fellow war veteran to induce him to commit the offense.

▮▮▮ Cases like *Jacobson, Sherman* and *Sorrells* demonstrate that even very subtle governmental pressure, if skillfully applied, can amount to inducement. In *Jacobson,* for example, the government merely advanced the view that the law in question was illegitimate and that, by ordering the prohibited materials, defendant would be joining in "a fight against censorship and the infringement of individual rights." *Id.* at 552, 112 S.Ct. 1535. In *Sorrells,* the inducement consisted of re-

---

**10.** Poehlman goes so far as to anticipate Sharon's rebuff of his advances. "I already know part of your answer . . . no nancy I have told you many times never to expect us to get together meaning me and you . . .

RIGHT..grin..I gotta have dreams ya know.. but I still know the answeres to things I write though I write them anyway." Appellant's Excerpts of Record at Tab 5 (Jan. 18, 1996).

peated requests, made in an atmosphere of comradery among veterans. *See Sorrells*, 287 U.S. at 439–41, 53 S.Ct. 210. In *Sherman*, the inducement consisted of establishing a friendly relationship with the defendant, and then playing on his sympathy for the supposed suffering of a fellow drug user. *See Sherman*, 356 U.S. at 371, 78 S.Ct. 819. In *Hollingsworth*, the inducement was nothing more than giving the defendant the idea of committing the crime, coupled with the means to do it. *See Hollingsworth*, 27 F.3d at 1200–02.

▉ Measured against these precedents, there is no doubt that the government induced Poehlman to commit the crime here. Had Sharon merely responded enthusiastically to a hint from Poehlman that he wanted to serve as her daughters' sexual mentor, there certainly would have been no inducement. But Sharon did much more. Throughout the correspondence with Poehlman, Sharon made it clear that she had made a firm decision about her children's sexual education, and that she believed that having Poehlman serve as their sexual mentor would be in their best interest. She made repeated references to her own sexual mentor, explaining that he could have mentored her daughters, had he not died in a car crash in 1985. *See* Appellant's Excerpts of Record at Tab 5 (Oct. 30, 1995). While parental consent is not a defense to statutory rape, it nevertheless can have an effect on the "self-struggle [to] resist ordinary temptations." *Sherman*, 356 U.S. at 384, 78 S.Ct. 819 (Frankfurter, J., concurring). This is particularly so where the parent does not merely consent but casts the activity as an act of parental responsibility and the selection of a sexual mentor as an expression of friendship and confidence. Not only did this diminish the risk of detection, it also allayed fears defendant might have had that the activities would be harmful, distasteful or inappropriate, particularly since Sharon claimed to have herself benefitted from such experiences. *See United States v. Gamache*, 156 F.3d 1, 11 (1st Cir.1998) ("[T]he government agent provided justifications for the illicit activity (intergenerational sex) by describing 'herself' as glad that Gamache was 'liberal' like her, expressing that she, as the mother of the children, strongly approved of the illegal activity, and explaining that she had engaged in this conduct as a child and found it beneficial to her.").

It is clear, moreover, that Poehlman continued to long for an adult relationship with Sharon, as well as a father-like relationship with the girls. He offered marriage; talked about quitting his job and moving to California; discussed traveling with Sharon and the girls; even offered his military health insurance benefits as an inducement. While refusing to give Poehlman hope of a sexual relationship with her, Sharon encouraged these fantasies; she went so far as to check out Poehlman's job prospects in California.[11] The government thus played on Poehlman's obvious need for an adult relationship, for acceptance of his sexual proclivities and for a family, to draw him ever deeper into a sexual fantasy world involving these imaginary girls.

As the First Circuit noted in a case with very similar facts, "[t]he record is clear that it was the Government's insistence and artful manipulation of appellant that finally drew him into the web skillfully spun by the detective." *Gamache*, 156 F.3d at 10.[12] Through its aggressive inter-

11. "I'll go by the cable TV place today and see if they're hiring and send you an application. I did find out that Disneyland is not hiring now (it's the off season) but might hire again in the spring time." Appellant's Excerpts of Record at Tab 5 (Jan. 18, 1996).

12. In *Gamache* the issue was whether defendant was entitled to an entrapment instruction, not whether he was entrapped as a mat-

ter of law. *See Gamache*, 156 F.3d at 12. We therefore rely on the reasoning of *Gamache*, not the result. Nevertheless we consider our ruling entirely consistent with *Gamache*. The defendant there did not, apparently, argue entrapment as a matter of law, perhaps because some of the evidence was in dispute. In our case, the evidence is mostly documen-

vention, the government materially affected the normal balance between risks and rewards from the commission of the crime, and thereby induced Poehlman to commit the offense.

### Predisposition

 The jury could, nevertheless, have found Poehlman guilty if it found that he was predisposed to commit the offense. Quite obviously, by the time a defendant actually commits the crime, he will have become disposed to do so. However, the relevant time frame for assessing a defendant's disposition comes before he has any contact with government agents, which is doubtless why it's called *pre*disposition. *See Jacobson*, 503 U.S. at 549, 112 S.Ct. 1535 (" '[T]he prosecution must prove beyond [a] reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents.' ") (quoting *United States v. Whoie*, 925 F.2d 1481, 1483–84 (D.C.Cir. 1991)). In our case, the question is whether there is evidence to support a finding that Poehlman was disposed to have sex with minors prior to opening his correspondence with Sharon.

The government argues that Poehlman was predisposed because he jumped at the chance to cross state lines to sexually mentor Sharon's children at the first opportunity available to him. But if willingness alone were the test, *Jacobson* would have come out differently. The defendant there had been contacted by government agents posing as organizations espousing the view that child pornography should be made legal, and asked a variety of questions about his interest in young boys. Jacobson expressed such an interest and, in response to "surveys," expressed the view that such materials should be made legal. The correspondence lasted two years, at the end of which the government (posing as one of these organizations) offered to sell him some magazines containing pictures of nude boys. Jacobson immediately

placed an order and was arrested after the materials were delivered. As the Seventh Circuit noted in *Hollingsworth*, Jacobson "*never* resisted" the government's offer. *Hollingsworth*, 27 F.3d at 1199.

Despite Jacobson's willingness to commit the offense at the first opportunity offered to him, the Supreme Court held that the government had failed to show predisposition because it had failed to show that he would have been disposed to buy the materials before the government started its correspondence with him. The fact that he was willing to order illegal materials after he'd been harangued by the government for over two years was not deemed sufficient to show predisposition. Jacobson's decision to order, the Court reasoned, could have been a consequence of the government's inducement.

By analogy, the fact that Poehlman willingly crossed state lines to have sex with minors after his prolonged and steamy correspondence with Sharon cannot, alone, support a finding of predisposition. It is possible, after all, that it was the government's inducement that brought Poehlman to the point where he became willing to break the law. As in *Jacobson*, we must consider what evidence there is as to Poehlman's state of mind *prior* to his contact with Sharon.

On this score, the record is sparse indeed; it is easier to say what the record does not contain than what it does. The government produced no e-mails or chat room postings where Poehlman expressed an interest in sex with children, or even the view that sex with children should be legalized. Nor did the government produce any notes, tapes, magazines, photographs, letters or similar items which disclosed an interest in sex with children, despite a thorough search of Poehlman's home. There was no testimony from the playmates of Poehlman's children, his ex-wife or anyone else indicating that Poehlman had behaved inappropriately toward

tary, and the facts are, essentially, agreed upon.

**704**

children or otherwise manifested a sexual interest in them. Sharon's ad, to which Poehlman responded, does not clearly suggest that sex with children was to be the object of the relationship: "Divorced mother of 3 looking for someone who understands my family's unique needs. Servicemen preferred. Please E-mail me at Darlings3@aol.com." Appellant's Excerpts of Record at Tab 5 (undated). While one might presume that one or more of the children are minors, the phrase "unique needs" could, just as easily, connote children with physical disabilities, or merely the plight of a single mother of three.

Poehlman does not appear to have responded to her ad because it mentions children or their special needs. During the crucial first few exchanges, *see* page 695–97 *supra*, when Sharon focused Poehlman's attention on those special needs, he expressed confusion as to what she had in mind. Instead of exploiting the ambiguity in Sharon's messages to suggest the possibility of sex with her daughters, Poehlman pushed the conversation in the opposite direction, offering to act as a father figure to the girls and teach them "proper morals." Appellant's Excerpts of Record at Tab 5 (Aug. 2, 1995). While Poehlman's reluctance might have been borne of caution—the way a drug dealer might demur when he is unsure whether a prospective buyer is a government agent—the fact remains that Poehlman's earliest messages (which would be most indicative of his preexisting state of mind) provide no support for the government's case on predisposition. To the contrary, Poehlman's reluctance forced Sharon to become more aggressive in her suggestions, augmenting the defendant's case for inducement. *See* page 698–99 *supra*.

Poehlman's enthusiastic, protracted and extreme descriptions of the sexual acts he would perform with Sharon's daughters are, according to the government, its strongest evidence of Poehlman's predisposition. Indeed, once he got the idea of what Sharon had in mind, Poehlman expressed few concerns about the morality, legality or appropriateness of serving as the girls' sexual mentor. But Poehlman was not convicted of writing smutty e-mails; he was convicted of crossing state lines, some six months later, to have sex with minors. The problem with using Poehlman's e-mails as evidence of predisposition is that they were all in response to specific, pointed suggestions by Sharon. The e-mails thus tell us what Poehlman's disposition was once the government had implanted in his mind the idea of sex with Sharon's children, but not whether Poehlman would have engaged in such conduct had he not been pushed in that direction by the government. In short, Poehlman's erotic e-mails cannot provide proof of predisposition because nothing he says in them helps differentiate his state of mind prior to the government's intervention from that afterwards.

It is entirely plausible to infer that, as in *Jacobson*, it was the government's graduated response—including e-mail correspondence, handwritten letters from the girls and Sharon, the use of intimate names, a photograph of Poehlman sent to Sharon, Poehlman handcrafting gifts for the girls and Sharon's willingness to help Poehlman look for a job in Southern California—that brought Poehlman to the point where he was willing to cross state lines for the purpose of having sex with the three young girls. Since the government has the burden of proof as to predisposition, materials like these e-mails, which do not demonstrate any preexisting propensity to engage in the criminal conduct at issue, simply cannot carry that burden.

▆▆▆ This is not to say that statements made after the government's inducement can never be evidence of predisposition. If, after the government begins inducing a defendant, he makes it clear that he would have committed the offense even without the inducement, that would be evidence of predisposition. But only those statements that indicate a state of

mind untainted by the inducement are relevant to show predisposition. Poehlman's protracted correspondence with Sharon, in fact, undermines the view that he was predisposed to commit the offense. Even as his e-mails became more intimate and explicit—usually in response to Sharon's constant hectoring for more details about Poehlman's lesson plans—he never gave any indication that being a sexual mentor to the girls in any way fulfilled his preexisting fantasies. To the contrary, Poehlman repeatedly tried to integrate Sharon's expectations of him into his own fantasies by insisting that the girls (and Sharon) parade around the house in nylons and high-heeled pumps ("as high of a heel as they can handle," Appellant's Excerpts of Record at Tab 5 (Nov. 7, 1995))—as Poehlman himself apparently does.

The only indication in the record of any preexisting interest in children is Poehlman's statement in the hotel room that he has "always looked at little girls." Testimony of Mark Poehlman, page 695 *supra.* But this is hardly an indication that he was prone to engage in sexual relations with minors. *See Jacobson,* 503 U.S. at 545, 112 S.Ct. 1535 (while defendant expressed interest in "good looking young guys (in their late teens and early 20's) doing their thing together," the Court noted that he "made no reference to child pornography"); *see also Hollingsworth,* 27 F.3d at 1202 ("Whatever it takes to become an international money launderer, they did not have it."). Having carefully combed the record for any evidence that Poehlman was predisposed to commit the offense of which he was convicted, we find none. To the extent the jury might have found that Poehlman was predisposed to commit the offense, that finding cannot be sustained.

### Conclusion

"When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Jacobson,* 503 U.S. at 553–54, 112 S.Ct. 1535. So far as this record discloses, Poehlman is such a citizen. Prior to his unfortunate encounter with Sharon, he was on a quest for an adult relationship with a woman who would understand and accept his proclivities, which did not include sex with children. There is surely enough real crime in our society that it is unnecessary for our law enforcement officials to spend months luring an obviously lonely and confused individual to cross the line between fantasy and criminality. The judgment of conviction is **REVERSED** on grounds of insufficiency of the evidence and the case is **REMANDED** with instructions that defendant be released forthwith.

The mandate shall issue at once. Fed. R.App. P. 2.

THOMPSON, Circuit Judge, dissenting:

I respectfully dissent. Our task as an appellate court is not to reweigh the evidence but to uphold the jury's verdict so long as substantial evidence supports it. The fact that we would have decided the case differently is irrelevant.

Viewing the evidence in the light most favorable to the government, we may reverse the jury's verdict only if no reasonable jury could have concluded that Mark Poehlman was not legally entrapped. *See United States v. Citro,* 842 F.2d 1149, 1151 (9th Cir.1988). Because there was sufficient evidence for a reasonable jury to find that the government did not induce Poehlman to commit the crime, the jury's verdict should be upheld.

Entrapment as a matter of law was not established in this case. Entrapment as a matter of law requires undisputed evidence establishing that the government induced the defendant to commit the crime and that the defendant was not predisposed to commit the crime. *See United States v. Lorenzo,* 43 F.3d 1303, 1305 (9th Cir.1995).

Poehlman failed to present " 'undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act.' " *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir.1992) (citation omitted); *see United States v. Manarite*, 44 F.3d 1407, 1418 (9th Cir. 1995) (defining inducement as "government conduct that creates a substantial risk that an otherwise law-abiding person will commit a crime"). Even though during the first two weeks of Poehlman's e-mail communications with the government agent posing as "Sharon" Poehlman revealed no sexual interest in children, Poehlman soon began to interpret purposely vague e-mails from Sharon as containing sexual undertones. *But cf. United States v. Gamache*, 156 F.3d 1, 4 (1st Cir.1998) (holding that the district court should have given an entrapment instruction based in part on the government's improper inducement and the government's first mentioning of children as sex objects). While the government sent Poehlman messages, it did not first suggest sexual relations with children nor propose any specific sexual acts. Moreover, the government's e-mails never forced Poehlman to respond and, in fact, offered Poehlman many opportunities to end the communications if he were interested in a relationship with Sharon and not the kids or if he were at all uncomfortable. The majority contends that the "clear implication of Sharon's messages" suggested that Poehlman have sex with the children, but, so long as ambiguous evidence requires inferences to be made, it is the role of the jury to draw such inferences. *See United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir.1987).

A reasonable jury could also have found that Poehlman was predisposed to commit the crime. We generally rely upon five factors in determining predisposition: (1) the defendant's character or reputation; (2) whether the government first suggested the criminal activity; (3) whether the defendant profited from the activity; (4) whether the defendant demonstrated re-

luctance; and (5) the nature of the government's inducement. *See Citro*, 842 F.2d at 1152. The defendant's reluctance generally receives the greatest weight. *See United States v. Thickstun*, 110 F.3d 1394, 1397 (9th Cir.1997).

Poehlman's character and the absence of a profit motive are two factors that weigh heavily in Poehlman's favor. Poehlman does not have a history of a sexual interest in children, and his e-mail communications with Sharon never revealed an interest in profiting from any sexual relationship. The other predisposition factors, however, tip in favor of the government. During the undercover operation, the government constructed purposely vague e-mail messages. While Poehlman claims that the government initiated the sexual conversation when Sharon wrote about the lessons for her children from a "special man teacher" and her desire to watch the lessons, Poehlman conceded at trial that Sharon "never came out and said that [he] have sex with the kids." Poehlman first introduced sexual remarks in his reply to the government's message stating Sharon's interest in finding a "special man teacher" for her children.

Although Poehlman's e-mail messages during the first two weeks of his communication with Sharon appeared free of sexual allusions directed toward her children, his communications for the next roughly 5–½ months detailed sexual acts that he would perform with Sharon's three children, even asking Sharon to put the two older girls on birth control. Moreover, just prior to Poehlman's arrest, a female undercover agent, posing as Sharon, presented Poehlman with a child pornography magazine and pointed to a particular picture depicting a child in a sexual act. When the officer asked Poehlman whether he thought the children "will be ready for this," Poehlman responded, "God, I hope so." Poehlman also remarked that he has "always looked at little girls." Although Poehlman at trial stated that he meant women over the age of eighteen, a reason-

able jury could have concluded that he revealed a predisposition toward having sexual relations with young children.

At trial, the government established that Poehlman first mentioned having sex with the children, and each proposed sexual act originated from him. Even though this case is not as clear cut as a case in which a defendant, for example, exemplifies predisposition by owning a library of explicit materials before the commencement of a sting operation, the jury heard enough evidence for it to reasonably conclude that Poehlman in fact had a predisposition to commit the crime.

As the majority acknowledges, the district court properly instructed the jury,[1] and Poehlman does not contend otherwise. What we are left with is a case in which the jury followed the court's correct instructions, considered the evidence, and simply rejected the defense. I would affirm the conviction.

---

1. The district court followed the Ninth Circuit Manuel of Model Jury Instructions 6.2.1 (1997) in instructing the jury that the government must prove the following:

 1. The defendant was predisposed to commit the crime before being contacted by government agents, or

2. The defendant was not induced by the government agents to commit the crime.

Where a person, independent of and before government contact, is predisposed to commit the crime, it is not entrapment if the government agents merely provide an opportunity to commit the crime.