Filed 10/20/15  P. v. Mendez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066113 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN312639) |
| JIMMY MENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William C. Gentry, Jr., Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Assistant Attorney General, Julie L. Garland, Eric A. Swenson, Lynne G. McGinnis and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jimmy Manuel Mendez of attending an arranged illicit meeting with a person he believed to be a minor, in violation of Penal Code[1] section 288.4(b) (count 1), and of attempting to contact or communicate with a minor to commit a sexual offense, in violation of section 288.3(a) (count 2). The trial court sentenced Mendez to 60 days in custody, with credit for time served, and placed him on probation for three years. On appeal, Mendez contends that he was entrapped as a matter of law, requiring reversal of the judgment of conviction. Reviewing the record in the light most favorable to the judgment, we conclude that there is sufficient substantial evidence to support the conviction and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2012, Mendez posted an online ad on Craigslist's Casual Encounters website, stating that he was 30 and "looking for a fwb [friend with benefits] in the north county area." His ad caught the attention of Damian Jackson, a detective with the Prevention and Child Exploitation Unit of the Escondido Police Department, because it lacked age parameters and stated, "I'm not picky[,] so don't be afraid or intimidated." Over the next day and a half, Mendez exchanged 93 e-mail messages and 212 text messages with Detective Jackson, who was posing as a 14-year-old girl named "Alexis."

"Alexis" responded to Mendez's Craigslist ad, asking, " r u cool with sum1 a lil younger?" Mendez asked, "how young?" and "Alexis" replied that she was 14. Mendez

---

[1]     All further statutory references are to the Penal Code, unless otherwise specified.

2

said, "Omg! that's real young!...lol" but did not terminate their conversation. "Alexis" offered Mendez the first of many opportunities to back out, saying: "thas cool I wont b a pest sry :)." Mendez reassured "Alexis" that she was not a pest and continued the conversation. He asked, "What exactly are you looking for out of this?" and asked "Alexis" for a picture. Detective Jackson sent a picture of a young female agent, to which Mendez replied, "And if that's really you, you don't look 14 in that pic..??? Lol" Mendez asked whether "Alexis" was "a cop or undercover cop or anything to do with any law enforcement agency." "Alexis" replied: "omg.. ur so funny NO im not a cop LOL."

Mendez asked "Alexis" about her prior sexual experience and whether she had ever "done this before"--i.e., "getting on CL and email random guys." She told him that she had once before. Mendez asked what "Alexis" had in mind, and "Alexis" deferred, saying: "im pretty down 4 whatev if we click rite." Mendez asked for another picture, and "Alexis" sent one. She said she did not have any full-body pictures to send but mentioned having a "down there pic." Mendez referenced that picture several different times, but "Alexis" did not send it.

Mendez asked "Alexis" what attracted her to older men. They spoke a bit about her high school and her parents' divorce. "Alexis" asked what Mendez was into, disclosing that she was not into "being treated mean or any butt stuff." Mendez replied that he was "not like that" and was "a cool chill guy that like[d] to have fun" and "make ppl have a good time and laugh." Mendez told "Alexis" that she was "very cool...sucks

your 14 tho!" He asked her, "So what do you like to do for fun? Or with a guy???"

"Alexis" replied: "if ur lettin me choose im mor n2 oral than anything else lol."

At that point, the two switched to text messages. Mendez initiated plans for the two to meet, asking, "So when would you like to hang out or what??" Alexis replied that she could sneak out later that night, after her mom went to bed. Mendez seemed surprised and replied: "it's just crazy Quick." "Alexis" again offered him a chance to back out, saying: "we dont have 2 " and "we can wait 4 sum other time if u want." Mendez replied, "It's up to you? I'm like I don't mind I'm down for whatevs lol." Mendez asked "Alexis" to suggest a meeting place and asked what they would do when they met. "Alexis" replied that she was "cool with oral if its in the car."

A short while later, Mendez asked, "Why are you so willing to meet up and not creeped out or nervous or anything like that lol I know I am lol." "Alexis" gave Mendez another chance to back out, saying "lets jus not meet up if ur sketchd out about it no fun lol." Mendez replied, "Nah it's cool I just never done this before with a girl your age and all lol but we can still meet up." "Alexis" said, "yeh thas cool jus dont want u 2 if u don't," but Mendez persisted, saying "I'm down if you're down" and confirmed that they were "still up for tonight." Mendez joked at one point that he expected Chris Hansen, the host of the TV Show "To Catch a Predator," to "pop out somewhere," but Detective Jackson pretended not to understand the reference. Mendez told "Alexis" that she was "so different from other teens."

4

Mendez agreed to meet "Alexis" at a grocery store parking lot that night, after her mother went to bed. A few hours later, Mendez asked if they were still planning to meet, saying that he would otherwise go shopping. "Alexis" again offered to meet Mendez another time, but Mendez said that he could shop after they met.

Around midnight, Mendez left his house, drove to the meeting spot, and made several loops around the parking lot. A surveillance team, planted outside his residence, followed him there. Mendez circled the lot a few times but drove away when he could not find someone matching "Alexis'" description. Police officers stopped his car shortly after Mendez left the parking lot. They arrested him and seized the iPod Touch used to communicate with "Alexis." Officers read Mendez his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), but he decided to speak with Detective Jackson.

In April 2013, the San Diego County District Attorney filed an information charging Mendez with four counts: attending and arranging an illicit meeting with a minor, in violation of section 288.4(b) (count 1); contacting a minor with the intent to commit a sexual offense, in violation of section 288.3(a) (count 2); attempting a lewd act upon a child 14 or 15 years of age, in violation of sections 288(c)(1) and 664 (count 3); and attempted oral copulation by one over 21 on a person under 16, in violation of sections 288a(b)(2) and 664 (count 4). The trial court scheduled a jury trial for April 7, 2014. Prior to trial, the Court granted the People's motion to dismiss counts 3 and 4.

5

At trial, the jury heard from Detective Jackson, who testified about his training and methods in investigating online child exploitation cases. He testified that Mendez was extremely persistent compared to his past cases, wanting to meet "Alexis" despite repeated chances to walk away. Detective Jackson agreed that there was a Craigslist disclaimer that users must be 18 years old and that Mendez's initial ad was "very tame compared to the other ones" on Craigslist. However, he testified that "nine out of ten times," when he responds with a specific age, as "Alexis" did in saying that she was 14, "that's where the communication stops." He testified that Mendez was the "driving force" behind the communications, initiating the request to meet and repeatedly asking when and where to meet. On cross-examination, Detective Jackson acknowledged that "Alexis" was the first to mention oral sex, but he testified that this remark had to be viewed in context of Mendez's inherently sexual questions. Detective Jackson testified that after his arrest, Mendez told him that he believed he was speaking to a 14-year-old girl. Detective Jackson denied ever having told Mendez that "Alexis" was an underage decoy.

The jury also heard from Mendez. Mendez testified that he had recently separated from his wife and had placed the ad looking for a relationship with a woman, not to interact with a minor. He explained that he was sexually inexperienced, having had only two sexual partners and no prior one-night stands, and that he had not been intimate with his wife. Mendez testified that he never believed that "Alexis" was 14, based on the

6

photo she sent. He maintained that he was "role playing" when he made references to "Alexis" being 14 and spoke about her high school and sneaking out after dark. He testified that he was surprised by how fast "Alexis" wanted to meet him, stating that he did not want to move that fast. Mendez testified that he was not physically attracted to "Alexis" in her photos but agreed to meet her in person because he did not want to be rude. Mendez denied stating that he planned to meet a 14-year-old girl after his arrest, testifying that he had not thought of "Alexis" as a 14-year-old until Detective Jackson informed him that she was an underage decoy.

On April 9, 2014, a jury convicted Mendez on counts 1 and 2. The court instructed the jury on Mendez's entrapment defense. On May 7 the court sentenced Mendez to 60 days in custody, with credit for time served, and placed him on probation for three years. Among the conditions of probation was the requirement that Mendez register as a sex offender pursuant to section 290.

Mendez filed a timely notice of appeal. He appeals on only one ground: that there was insufficient evidence to sustain his conviction because he was entrapped as a matter of law. Specifically, Mendez argues on appeal that Detective Jackson engaged in conduct that would have induced a normally law-abiding person to commit the crimes with which he was charged. For the reasons discussed below, we disagree.

STANDARD OF REVIEW

When we review an appeal that is based on insufficient evidence to support a conviction, we apply the substantial evidence standard of review. Under that standard, we review the entire record in the light most favorable to the trial court judgment. We draw all reasonable inferences in favor of the judgment, but we do not weigh the evidence nor make credibility determinations. " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*)

DISCUSSION

A. *Entrapment*

"In California, the test for entrapment focuses on the police conduct and is objective." (*People v. Watson* (2000) 22 Cal.4th 220, 223.) "[T]he proper test of entrapment in California is the following: was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? . . . Official conduct that does no more than offer that opportunity to the suspect--for example, a decoy program--is therefore permissible; but it is impermissible for the police or their

8

agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*People v. Barraza* (1979) 23 Cal.3d 675, 689-690.)[2]  The California standard presumes that a law-abiding person would "normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully." (*Id.* at p. 690.) A defendant's lack of predisposition to commit the crime does not establish entrapment. (*Id.* at pp. 690-691.)[3]

At trial, the jury was fully and fairly instructed on the defense of entrapment and, by its verdict, rejected it.  Mendez nonetheless contends that he was entrapped as a matter of law.  We disagree.

"An appellate court will only find entrapment as a matter of law where the evidence is so compelling and uncontradicted the jury could draw no other reasonable inference." (*People v. Thoi* (1989) 213 Cal.App.3d 689, 694.)  Here, we conclude that a

---

[2]     Mendez argues that entrapment requires only "an 'offer' which fosters a crime which would not otherwise have occurred."  This misstates the standard under California law. (*People v. Barraza*, *supra*, 23 Cal.3d at p. 690.)

[3]     Mendez cites *United States v. Poehlman* (9th Cir. 2000) 217 F.3d 692 (*Poehlman*), and *Jacobson v. United States* (1992) 503 U.S. 540 (*Jacobson*), relying on what he perceives to be the federal standard for entrapment.  However, this Court relies on the California standard. (*People v. Barraza*, *supra*, 23 Cal.3d at pp. 690-691 ["[U]nder this test such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant"]; *People v. Benford* (1959) 53 Cal.2d  1, 12 ["Since the prosecution in California cannot prove prior criminality of defendant to overcome the defense of entrapment, the absence of such evidence here does not in and of itself have the significance which it had under federal law"].)

reasonable jury could find that Detective Jackson did "no more than offer that opportunity" for Mendez to arrange to meet with someone he believed to be a 14-year-old girl. Consequently, we cannot conclude that Mendez was entrapped as a matter of law.

Mendez raised the entrapment defense before the trial court, and the court instructed the jury on entrapment with CALCRIM No. 3408. There were no objections made at the trial court or on appeal as to the jury instructions found in CALCRIM No. 3408. The jury weighed Mendez's testimony against Detective Jackson's on the issue of entrapment and reviewed the full string of text and e-mail communications between Mendez and "Alexis." Mendez never challenged the accuracy of the transcripts of messages between him and "Alexis." The jury convicted Mendez on both counts, necessarily finding that Mendez had not met his burden to prove entrapment.

Throughout their text and e-mail conversations, Mendez made repeated references to "Alexis" being 14—for example, remarking "Omg! that's real young!" when she revealed her age; "sucks your 14 tho;!" "I just never done this before with a girl your age and all lol but we can still meet up;" "U are so different from other teens its crazy;" and "whY do you like old guys? It's not common for young teens to like older guys." Mendez asked "Alexis" about her high school and her prior sexual experience and planned for her to sneak out to meet after her mom went to sleep. He asked whether "Alexis" was "a cop or undercover cop" and joked that he expected Chris Hansen, the host of the TV Show "To Catch a Predator," to "pop out somewhere." The jury heard Mendez's testimony that

10

he never believed "Alexis" to be 14, but this was contradicted by his admission to Detective Jackson that he was "going to meet this 14-year-old girl" to warn her "that it's probably not a good idea for 14-year-old girls to be meeting with people that they meet on Craigslist."[4]

Detective Jackson, posing as "Alexis" rebuffed Mendez at least six times, offering him several chances to back away. For example, after Mendez expressed surprise at her age, "Alexis" offered to leave him alone, saying "thas cool i wont b a pest sry." Mendez chose to continue the conversation, saying "Nah no worries...your not a prest [sic]" and asking "Alexis" to send a picture. This happened multiple times during their conversation: "Alexis" would offer Mendez a chance to back away, but Mendez chose to re-engage.[5] One hour before they were scheduled to meet, "Alexis" gave Mendez a final chance to back out, but Mendez declined and left his house to meet "Alexis" at the

---

[4] Mendez alludes to the fact that "Alexis" appeared much older than 14 in her photographs. To the extent this is offered in support of his entrapment defense, it is unavailing. (*See*, *e.g.*, *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 568-570 [alcohol vendor not entrapped by the use of underage, but mature-looking decoys because "the seller cannot avoid liability by relying solely on the appearance of the buyer," and "the decoys simply bought beer and wine, without attempting to pressure or encourage the sales in any way"].)

[5] Specifically after that first rebuff, "Alexis" told Mendez: "if ur sketch tho i wont bug u seroiusly im not n2 makin any drama" (3:45 p.m.); "we dont hav 2 lol you seem all surprised" (5:31 p.m.); "we can wait 4 sum other time if u want" (5:33 p.m.); "lets jus not meet up if ur sketchd out about it thas no fun" (7:25 p.m.); "yeh thas cool jus dont want u 2 if u dont" (7:42 p.m.); "im cool with meetin up but if yer shoppin n stuff then we can sum othrr time i guesd" (10:32 p.m.); "oh u sounded like u didnt want 2 an wer goin shoppin" (10:47 p.m.).

arranged meeting spot. Detective Jackson testified that this was the most he has had to rebuff someone in the course of an investigation and that Mendez was "probably the most persistent of all the cases I have worked with [in terms of] the level of repetitive communication with us." He testified that he perceived Mendez, not "Alexis," to be the "driving force" of the conversation.

The jury heard evidence that while "Alexis" was the first to mention oral sex, this remark responded to an inherently sexual line of questioning from Mendez. Twelve minutes after "Alexis" voiced her preference for oral sex (and less than 24 hours after their first communication), Mendez asked, "So when would you like to hang out or what??" The jury heard uncontroverted evidence that Mendez, not Detective Jackson, initiated the plan to meet with someone posing as a minor. Mendez repeatedly asked for details on when and where to meet—by Detective Jackson's count, he asked "Alexis" for this information no less than 45 times. After "Alexis" mentioned having a "down there" picture, Mendez brought it up numerous times, offering to send another picture "if you send me that one" and saying "Sooo I guess I won't be getting that pic huh?" when "Alexis" did not send it. (Mendez testified at trial that he was referencing a full-body picture, not a nude picture.)

Viewing the record in the light most favorable to the judgment, as we must, a reasonable jury could have found that Detective Jackson, at most, extended an opportunity for Mendez to seek sexual relations with someone he believed to be a 14-

12

year-old girl.  The number of opportunities afforded to Mendez to back out does not necessitate the conclusion that the police caused a normally law-abiding person to commit a crime.  There is no evidence in the record to support that "Alexis" badgered or cajoled Mendez, preyed on his sympathies or insecurities, induced him with guarantees that he would not get caught,[6] or took any "other affirmative acts likely to induce a normally law-abiding person to commit the crime."  (*People v. Barraza*, *supra*, 23 Cal.3d at p. 690.)  Indeed, while the jury heard evidence that Mendez was sexually inexperienced and had recently separated from his wife, Mendez never disclosed these facts, or any other personal details, to "Alexis."[7]

In short, while a different jury might have reached a different conclusion, there is sufficient evidence in the record to support this jury's conclusion that the police did not entrap Mendez.  (*See*, *e.g.*, *People v. Federico* (2011) 191 Cal.App.4th 1418, 1423 [no entrapment where the decoy "merely provided an opportunity for defendant to spend time

6    The denial by "Alexis" that she was an undercover agent does not constitute such a guarantee. (*People v. Barraza*, *supra*, 23 Cal.3d at p. 690, fn. 4 ["There will be no entrapment, however, when the official conduct is found to have gone no further than necessary to assure the suspect that he is not being 'set-up' "].)

7    Mendez's federal cases, *Poehlman* and *Jacobson*, are also distinguishable on this basis, *Poehlman* involved six months of e-mail correspondence between defendant and a decoy, who pressed defendant to serve as her daughter's sexual mentor as a condition for their further communication and companionship. (*Poehlman*, *supra*, 217 F.3d at p. 702.) *Jacobson* involved 26 months of repeated mailings and communications from government agents and fictitious organizations to lure defendant into receiving child pornography. (*Jacobson*, *supra*, 503 U.S. at p. 548.)  By contrast, Mendez asked to meet "Alexis" after less than 24 hours of correspondence and persisted in wanting to meet "Alexis" despite several opportunities to back out.

alone with a 12-year-old girl in an empty house"].)  Here, as in *People v. Peppars* (1983) 140 Cal.App.3d 677, "[t]he trial court properly submitted the issue of entrapment to the trier of fact, and it cannot be said that there is no substantial evidence to support the implied finding of the jury that the conduct of [the police] was *not* likely to induce a normally law-abiding citizen . . . to commit [the crime]."  (*Id.* at p. 685.)

## B. *Testimony of Detective Jackson*

Although not clearly articulated in the briefs, Mendez appears to challenge the trial testimony of Detective Jackson about the TV show, "To Catch a Predator."

At trial, Detective Jackson testified about his extensive training in investigating online child exploitation cases.  He testified on direct examination that he applied "a set protocol and manner" to avoid the legal pitfalls and ramifications of entrapment.  In providing this testimony, Detective Jackson referenced "To Catch a Predator," clarifying that the TV show used techniques geared for ratings, whereas his investigations aimed to comply with certain legal requirements.  Defense counsel objected on relevance grounds, but the court overruled.  Later into his direct examination, the court ruled that entrapment was an issue for the jury but allowed Detective Jackson to testify as to his mental impressions in conducting his investigation.

On cross-examination, defense counsel asked Detective Jackson a series of questions about "To Catch a Predator," ostensibly trying to demonstrate that his methods were similar to the questionable methods used on the show.  The court sustained the

prosecution's objection, ruling that it saw no connection between the TV show and Detective Jackson's investigation and was "disinclined" to allow a trial of "To Catch a Predator" to unfold within this trial.[8]

On appeal, Mendez appears to argue that Detective Jackson's testimony about "To Catch a Predator" demonstrates bias, tarnishing his whole opinion. Specifically, Mendez contends that "the jury's consideration of the evidence was tainted [by] Detective Jackson's emphasis on his own self-touted lack of entrapment, as contrasted with To Catch a Predator." Therefore, he argues, Detective Jackson's testimony "was entitled to no weight, as an opinion of no entrapment." Mendez contends that "[n]ot just the detective's entrapment opinion, but to some degree all of his testimony, was at least slightly tarnished by his biased interjection of matters he must have known were not proper. . . . It was really unfair for him to use To Catch a Predator to bolster his credibility, then stonewall reasonable defense cross-examination on just how his practices varied from those on the suspect show."

---

[8] It is not clear whether Mendez intends to challenge this evidentiary ruling on appeal. In any event, the trial court did not abuse its discretion in sustaining the prosecution's objection to cross-examination questions about "To Catch a Predator." The court acted within its discretion under Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time. (*People v. Pearson* (2013) 56 Cal.4th 393, 455 ["Although we have said that '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' . . . , such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' "].)

15

At the outset, this argument misstates the standard. Under California law, the inquiry on appeal is not whether the prosecution overcame the defendant's entrapment defense (e.g., by providing evidence of no entrapment), but rather whether the evidence shows that entrapment occurred as a matter of law. (*See*, *e.g.*, *People v. Benford*, *supra*, 53 Cal.2d at p. 12 ["Our inquiry is not, as defendant's argument suggests, whether the prosecution has 'overcome the defense of entrapment' . . . but, as he states elsewhere in his briefs, whether the prosecution evidence as a matter of law shows entrapment"].)

Furthermore, Mendez appears to be asking this Court to reweigh the credibility of Detective Jackson on appeal. This we cannot do. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357 [on review for substantial evidence, the appellate court defers to the trial court on witness credibility]; *People v. Jones* (1990) 51 Cal.3d 294, 314-315 ["it is not a proper appellate function to reassess the credibility of the witnesses"].) "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." (*People v. Kelley* (1984) 158 Cal.App.3d 1085, 1101; *People v. Hovarter* (2008) 44 Cal.4th 983, 996 ["Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution"].) We cannot make such a determination here.

DISPOSITION

The judgment is affirmed.

                                              HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.