**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MOHAMED OSMAN MOHAMUD,
*Defendant-Appellant.*

No. 14-30217

D.C. No.
3:10-cr-00475-KI-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted July 6, 2016
Portland, Oregon

Filed December 5, 2016

Before: Harry Pregerson, Carlos T. Bea,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

# SUMMARY[*]

## Criminal Law

The panel affirmed Mohamed Osman Mohamud's conviction for attempting to detonate a large bomb during the annual Christmas Tree Lighting Ceremony in downtown Portland, Oregon, in violation of 18 U.S.C. § 2332a(a)(2)(A).

The panel held that the district court properly rejected Mohamud's defense of entrapment as a matter of law. The panel could not say that no reasonable jury could have concluded that Mohamud was predisposed to commit the charged offense. Rejecting Mohamud's alternative argument that the case should be dismissed because the government overreached in its "sting," the panel wrote that while the government's conduct was quite aggressive at times, it fell short of a due process violation.

The panel held that, under the circumstances of this case, the district court did not err in denying Mohamud's motion to suppress, based on tardy disclosure, information collected pursuant to § 702 of the Foreign Intelligence Surveillance Act of 1978. The panel wrote that Mohamud cannot demonstrate prejudice, and that the district court did not err in finding that the late disclosure was not due to prosecutorial misconduct.

The panel held that the § 702 acquisition of Mohamud's email communications did not violate the Fourth Amendment. The panel noted that all this case involved was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the targeting of an overseas foreign national under § 702, through which Mohamud's email communications were incidentally collected. The panel held that no warrant was required to intercept the overseas foreign national's communications or to intercept a U.S. person's communications incidentally. Assuming that Mohamud had a Fourth Amendment right in the incidentally collected communications, the panel held that the search was reasonable under the Fourth Amendment. The panel wrote that declassified facts foreclosed the argument that the discovery in this case strayed from protecting the country from a terrorist threat into the conduct of foreign affairs. Because no retention and querying of the incidentally-collected communications is at issue in this case, an argument regarding reasonableness was outside the scope of this court's review. The panel held that under the third-party doctrine, Mohamud had a reduced expectation of privacy in his communications to third parties. The panel held that Foreign Intelligence Surveillance Court-approved targeting and minimization procedures, which were followed in practice, sufficiently protected Mohamud's privacy interest, in light of the government's compelling interest in national security.

## COUNSEL

Stephen R. Sady (argued), Chief Deputy Federal Public Defender; Mark Ahlemeyer, Assistant Federal Public Defender; Lisa C. Hay, Federal Public Defender; Office of the Federal Public Defender, Portland, Oregon; Steven Toby Wax, Portland, Oregon; for Defendant-Appellant.

Kelly A. Zusman (argued), Appellate Chief; Ethan D. Knight, Pamala R. Holsinger, and Ryan W. Bounds, Assistant United States Attorneys; Billy J. Williams, Acting Assistant United States Attorney; United States Attorney's Office, Portland, Oregon; Joseph F. Palmer, Attorney, Appellate Unit; John P. Carlin, Assistant Attorney General; National Security Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Patrick C. Toomey (argued) and Alex Abdo, New York, New York; Andrew Crocker and Mark Rumold, San Francisco, California; Mathew W. dos Santos, Portland, Oregon; as and for Amici Curiae American Civil Liberties Union, American Civil Liberties Union of Oregon, and Electronic Frontier Foundation.

Joshua L. Dratel, Law Offices of Joshua L. Dratel P.C., New York, New York; John D. Cline, Law Office of John D. Cline, San Francisco, California; for Amicus Curiae National Association of Criminal Defense Lawyers.

**OPINION**

OWENS, Circuit Judge:

Mohamed Osman Mohamud appeals from his conviction for attempting to detonate a large bomb during the annual Christmas Tree Lighting Ceremony in Pioneer Courthouse Square in downtown Portland, Oregon, in violation of 18 U.S.C. § 2332a(a)(2)(A). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.[1]

## I. FACTUAL BACKGROUND

### A. Mohamud's Activities Before Contact with the FBI

In many respects, Mohamud was like any other American teenager. He liked music, the Los Angeles Lakers, and hanging out with his friends. Born in Somalia, he immigrated to the United States at the age of three, and grew up in the Portland area.

But after a December 2008 incident at London's Heathrow Airport, things changed. Believing that airport security racially profiled him, Mohamud wrote an email in London stating that it is "the evil zionist-crusader lobbyists who control the world," and calling on Allah to send fighters against them. He also created a new email account while in London—truthbespoken@googlemail.com. That email account would play a significant role in the prosecution's case.

---

[1] We resolve several of Mohamud's arguments in a concurrently filed memorandum disposition.

In 2009, Mohamud began communicating over the Internet with Samir Khan, a United States citizen then living in North Carolina.[2]  Khan published *Jihad Recollections*, an online magazine aimed at English-speaking al-Qaeda supporters.  From February to August 2009, Mohamud and Khan exchanged roughly 150 emails, with Mohamud using his truthbespoken email account.  Topics included Islamic law and advice about personal relationships.  They also outlined Mohamud's support for Osama bin Laden.

During this time period, Mohamud wrote four articles for *Jihad Recollections*.[3]  Among other things, the articles recommended physical exercise to prepare for war with the West and analyzed Europe's vulnerability to a jihadi attack. Mohamud's initial drafts of these articles contained more incendiary content.  For example, Mohamud praised the proficiency of the September 11, 2001, hijackers who "hit them so fast the Americans became dumbfounded," the 2008 Mumbai attackers, who were "a great display of quickly entering the arena of battle and just decimating the kuffar [unbelievers]," and the fighters in Afghanistan who attacked landing American helicopters and then "finish[ed] off the wounded American soldiers."  Mohamud also prayed for Allah to help the reader "prepar[e] you to meet Allah as a martyr" and included a photograph of the Twin Towers burning during the September 11th attacks.  Khan removed

---

[2] The September 2011 drone strike in Yemen that killed Anwar al-Awlaki, an al-Qaeda leader, also killed Khan.

[3] Three of the articles were published under the pen name Ibn al-Mubarak.  Mohamud was not credited with publishing the fourth article, which appeared in *Jihad Recollections* under a different pseudonym, Abu Talha.

this more inflammatory material from the final versions of Mohamud's articles. On August 15, 2009, Mohamud informed Khan that he would no longer write for *Jihad Recollections* because he was "going through alot [sic] of things and i have a lot of things to do."[4]

Mohamud also struck up a relationship with Amro Al-Ali, a Saudi citizen who Mohamud met at a Portland mosque and who subsequently left the United States.[5] On August 31, 2009, Al-Ali sent information to Mohamud at his truthbespoken email account about an Islamic school in Yemen. That same day, Mohamud called his father to say that he was leaving the country. His father begged him to stay in the United States, but Mohamud told him it was too late—he had his passport, visa, and ticket ready to go. When his parents confirmed that his passport was missing, they feared that Mohamud might return to Somalia, his place of

---

[4] Mohamud also engaged in other pro-jihadi Internet activities. In June 2009, for example, he posted on a website that he was working on an "Islam's [M]ost Wanted List," which would be a "Black list" of people who had "offended Allah."

[5] Saudi officials suspected Al-Ali had links to terrorist groups, and requested an Interpol Red Notice for his arrest. A Red Notice serves as an international wanted notice and provides information on the identification of fugitives charged with or convicted of serious crimes. Although Interpol will not publish requested Red Notices that violate Interpol's Constitution, which prohibits the organization from undertaking any activities of a political, military, religious or racial character, *see* Interpol Const., art. 3, Interpol does not independently vet the governmental request for a Red Notice for its factual and legal justification. The Red Notice led the FBI to consider Al-Ali a "dangerous [person] overseas" and to view Mohamud's communications with Al-Ali with concern. There was no evidence at trial that Mohamud knew of the Red Notice, which was non-public, or the FBI's interest in Al-Ali.

birth. And when they could not reach Mohamud, they called the FBI and asked an agent to stop their son from leaving the country. Eventually, Mohamud's mother got in touch with her son, scolded him, and brought him home. Mohamud did not actually have a visa or plane ticket, and he returned his passport to his parents. A few days later, Mohamud's father called the FBI agent back and told him that Mohamud had agreed to finish college and would not leave the country until he graduated. He also explained that his son had wanted to go to Yemen to study Arabic and Islam. Mohamud's father forwarded the FBI an email from his son about a school in Yemen, which allowed the FBI to identify Mohamud as the user of the truthbespoken email account.

**B. Mohamud Attends College and the FBI Initiates Its Investigation**

In September 2009, Mohamud began studying engineering at Oregon State University in Corvallis, where he had a "typical" college experience: he had a roommate, made friends, and attended parties (where he drank alcohol and used marijuana). His activities and religious principles often clashed, and in November 2009 he sought advice from a Muslim website on the difficulties of living a pious life on a college campus.

After the urgent August 31, 2009 call from Mohamud's father, the FBI opened an investigation into Mohamud. Agents conducted physical and electronic surveillance of Mohamud, but did not identify any overtly dangerous communications. The case agent believed that Mohamud's communications lacked "the same radical speak that he had espoused early on when he was communicating with Samir Khan." The agent opined that Mohamud had "left behind his

radical thinking" and was a "pretty manipula[ble], conflicted kid."

## C. The FBI's First Direct Contacts with Mohamud

In November 2009, a contractor working undercover for the FBI—using the alias "Bill Smith"—emailed Mohamud at his truthbespoken account. Pretending to be an isolated Muslim in eastern Idaho, the contractor asked Mohamud for advice on how to get more involved in "the fight" for the Islamic community, and he stated that he wanted "to help rid the occupiers from [P]alestine." Although Mohamud gave some general advice to move to a community with more Muslims, take care when talking about such issues online, and look out for "spies," he never openly encouraged the contractor to commit acts of violence. By May 2010, their email communications had ended.

Mohamud planned to work in Alaska with his college roommate during the summer of 2010. But when his parents brought him to the Portland airport, he was not permitted to fly to Alaska. Instead, FBI agents met with Mohamud and his parents at the airport and questioned them. When asked, Mohamud denied having a ticket or visa to travel to Yemen, or having any interest in jihadi websites. When asked if he knew anyone in Yemen, he said "Amr," but provided little detail. Mohamud made no mention of his *Jihad Recollections* articles or similar writings. When Mohamud returned home, he drafted a "To do list" which included "Find a job," "Work till September," get help from his parents for food and rent, and "you might have to take less classes" at Oregon State.

### D. Introduction to FBI Undercover Agent "Youssef"

### 1. The Initial Email Contacts

On June 23, 2010, an FBI undercover agent, using the alias "Youssef," emailed Mohamud at his truthbespoken account and instructed him to set up a new "hushmail" email account that would be secure and encrypted. Mohamud responded later that same day: "assalamu alaykum [God be with you] brother how are you[?]" Two days later, Youssef emailed Mohamud again:

> Wa alaikoom salem. hamdullah i am good brother thank you for asking. i'm sorry for the delay in our communication, we've been on the move. jazakallah khairan for responding so soon. are you still able to help the brothers? in sha'allah, i'll hear from you soon. Salem, Youssef.

Mohamud responded the same day that he was unable to travel:

> i have been betrayed by my family, i was supposed to travel last year but Allah had decreed that i stay here longer than my heart desired. i am trying to find a way to go. i do not think i will be able to go for a while. i need to save up and also clear up somethings [sic]. look for my emails inshallah, i will contact you when i am able to travel. pray for me that allah will free my passage from the lands of the polytheists, peace be upon the

messenger of Allah, his family and his companions.

Three days later, on June 28, 2010, Youssef replied that "Allah (SWT) i'm sure has good reason for you to stay where you are" and asked to meet Mohamud. About two weeks later, when Mohamud had still not responded, Youssef sent a follow-up email. A week later, on July 16, 2010, Mohamud responded and agreed to meet.

Youssef declined Mohamud's suggestion to meet at the local mosque because he wanted to meet privately and "the kuffar [unbelievers] have eyes and ears in almost all masjids in the US." Mohamud responded that he would "have a set of questions for you when we meet" to "make [s]ure you are not a spy yourself." Mohamud also wrote that "amr" (as in Amro Al-Ali) was the only person who could have given Youssef his email address, so he would want to know how Youssef knew Al-Ali as a "precaution." Youssef praised Mohamud for thinking about security.

### 2. The First Meeting with Youssef

On July 30, 2010, Youssef met Mohamud for the first time in downtown Portland.[6] Youssef told Mohamud he was from an "ihataa" (a religious "council") and was interviewing seven people in the United States and Canada for possible

---

[6] Although Youssef was wearing a transmitter and a recording device, the meeting was not recorded because the battery accidentally had been drained. An FBI agent listened to their conversation and summarized it in a report. The agent could not hear the first ten minutes, so he relied on Youssef to tell him what occurred. Every other in-person meeting between Mohamud and undercover agents was recorded and proffered as evidence at trial.

inclusion in a council project.[7]   Youssef asked Mohamud "what he had been doing lately to continue being a good Muslim."  Mohamud said that he had been writing poetry and articles for *Jihad Recollections*.   Mohamud asked Youssef how he got his email address, and Youssef explained that the council had forwarded it to him.

When asked about travel, Mohamud described his unsuccessful attempt to go to Alaska.  And when asked what he was "willing to do for the cause," Youssef testified that Mohamud said that "originally he had planned to wage war within the United States," but then he dreamt that he traveled to Yemen, received training, and "went to Afghanistan where he led an army against the kuffar or the unbelievers."

Youssef asked Mohamud again what he would do for the cause, and Mohamud responded, "anything."  When offered five ways to be a good Muslim—(1) pray five times a day; (2) go to school to learn something that would help the brothers overseas, such as engineering or medicine; (3) raise money for the brothers; (4) become operational; or (5) become a martyr—Mohamud almost immediately picked "become operational."  Mohamud explained "operational" meant "doing like the other brothers do when they get a car, fill it with explosives, park it near a target location, and detonate the vehicle."  When asked about targets, Mohamud said he had thought about Washington, D.C., because of all the government buildings, but admitted he was not familiar with the area.  Youssef told Mohamud to research possible

---

[7] The FBI invented this "council" to serve as a fictional intermediary between Al-Ali and Youssef because Youssef would not be able to answer many questions about Al-Ali.

targets in Portland, and that he had a "brother that could help him with explosives."

About four hours after their meeting, Mohamud sent Youssef an unprompted email with copies of his three articles published in *Jihad Recollections*.[8]  Youssef replied that Mohamud was "talented."[9]

### E.  Meeting with "Hussein"

A few weeks later, on August 19, 2010, Youssef met with Mohamud again in downtown Portland and introduced him to "Hussein," an undercover FBI agent posing as an al-Qaeda explosives expert.  Youssef described Mohamud as a "jewel in the rough."  During the meeting, Mohamud told the agents he admired the Mumbai terrorist attack (in which ten men stormed buildings in Mumbai, India, and killed 164 people).

About thirty-four minutes into the meeting, Mohamud told the agents that he wanted to detonate a bomb in Pioneer Courthouse Square during the annual Christmas Tree Lighting Ceremony on November 26, 2010, the day after Thanksgiving.  Mohamud explained that he had researched other potential targets, but this was the best option because:

---

[8] Mohamud also sent Youssef an article he had recently submitted to *Inspire*, the successor to *Jihad Recollections*, observing that: "Much can be done to hurt the enemy or prepare for Jihad.  According to your circumstances you could perform Jihad against the enemy where you are currently living by Mumbai style attacks, but my article is directed towards those brothers waiting to travel to the lands of Jihad rather than touch upon the issue of attacks within the Western nations."

[9] The undercover agents frequently flattered and praised Mohamud for his good writing or behavior.

(1) he could drive a car right into the Square from the street; (2) many people would be there; (3) nobody expected an attack in Portland; and (4) security would be light. Mohamud said that he planned on being in the car when it blew up. The agents (who were not familiar with Portland) had no input into Mohamud's chosen target.

Youssef wanted Mohamud to realize the seriousness of what he was saying. Mohamud assured them he did. He said that "since I was fifteen I thought about all this things before," and explained:

> [I]magine every day we see you know in Arab, you know, newspapers and news you know our people are killed you know. So for us to see that you know it would be a smile from me to see them in the same. You know, you know what I like, what makes me happy? You know, what I like to see? Is when I see the enemy of Allah then they are you know their bodies are torn everywhere. . . . That gives me you know like high hope and happiness you know.

When Youssef pointed out that there would many women and children at the event, Mohamud responded:

> [I]n general just a huge mass that will, you know like for them you know to be attacked in their own element with their families celebrating their holidays. And then for later on to be saying this was done for you to refrain from killing our children, women.

The agents told Mohamud there was "no shame" in not going through with his plan. They reminded him that "[w]ith us you always have a choice." When asked what he would have done if he had not met the agents, Mohamud said that he had planned to leave the country, "find the right people," "be somewhere they cannot capture you," and meet up with Al-Ali. The three then walked to Pioneer Courthouse Square, where Mohamud detailed the proposed attack.

Two days later, Youssef emailed Mohamud that he and Hussein would present Mohamud's plan to the "council." He also asked Mohamud to explain his rationale for the attack, as "a bomb is a very serious matter." Mohamud replied that he had prayed for guidance and that his faith "was sky high for no apparent reason," which he saw as a sign "that the traffic[] [l]ight is green lol."

## F.  Youssef and Hussein Test Mohamud's Resolve

On September 7, 2010, Youssef and Hussein met again with Mohamud. They convinced Mohamud not to martyr himself (i.e., to detonate the bomb remotely), and offered to help him leave the country after the bombing. They also advised that he did not have to go forward with the plan. The agents showed Mohamud an FBI-produced mock jihadi training video, which included an explosion being triggered by cell phone. Mohamud said the video was "beautiful."

To test his resolve, the agents gave Mohamud $2,800 to carry out specific tasks: purchase a list of bomb components, decide where to park the van with the bomb, and rent his own

apartment.[10]   On October 3, 2010, they again met with Mohamud and told him to rent a storage unit for the van. Mohamud completed these tasks.

### G.  The Test Bomb

On November 4, 2010, Mohamud, Youssef, and Hussein drove to the Oregon countryside to explode a test bomb.  On the drive, when asked what he wanted to do once he was overseas, Mohamud first said he wanted to learn Arabic, and later that he wanted to learn "the inside and out of weaponry" and "bomb-making."  When asked whether he saw himself teaching, he said he also wanted to teach "special operations," and specialize in "making the enemies you know afraid." During this conversation, Mohamud stated that "these people who live in this country are the most evil people on earth."

Hussein again advised that Mohamud did not have to go through with the bombing.  Mohamud ignored him, instead commenting on the irony of the term "Black Friday," the day after Thanksgiving.  When asked if he had told anybody about the plan, Mohamud responded that his image was "just a college student" and "nobody even knows that I have you know, that I'm inclined toward jihad, or even towards even like being Islamic."

To test the bomb, Mohamud pushed buttons on a cell phone, which appeared to trigger an explosion, though an FBI agent actually detonated the bomb.  After the explosion, Mohamud said "God is great" in Arabic, that he felt "good,"

---

[10] Youssef explained that the FBI did not want Mohamud to have a roommate because it would be easier to maintain surveillance and reduce the chance that Mohamud would take matters into his own hands.

and that the bomb test was "just motivation for me." When Youssef and Hussein asked if he had ever seen dead bodies, Mohamud responded that he thought it was "awesome" when people were jumping from skyscrapers during the September 11th attacks.

On the ride home, Youssef suggested that Mohamud make a "good-bye" video to explain his actions because it could be "inspirational."[11] Mohamud ultimately agreed and wrote a script for the video using topics Youssef suggested.

Mohamud made the video later that day, and explained that this is a "message . . . to those who have wronged themselves." He described the "dark day" that was coming, and said that no one would be safe "for as long as you threaten our security." He said that living in the United States "is a sin," and urged that Muslim parents living in the West not do what his did to him—that is, not "hold others back from completing their obligation" to Allah. Mohamud finished by reading his own poem that extolled the virtues of Muslims and jihad, and ended with a call to:

> Carry on oh brothers, and march on ahead to meet your creator and lie on silk beds, and the martyrs don't die, so don't say they're dead. . . . Explode on these kuffar [unbelievers]. Alleviate our pain. Assassinate their leaders, commanders, and chiefs. From your brother to his brother a poem in brief.

---

[11] On cross-examination, Youssef agreed that he had his "finger on the scale" and was trying to influence Mohamud to make the video, and that Mohamud initially wanted to wait to make the video until he was abroad.

**H.  The Final Countdown**

About a week after the test bomb, Mohamud exchanged emails with a friend in Afghanistan.  On November 13, 2010, the friend asked Mohamud to "investigate" predator and reaper strike drones to figure out "how to down them."  On November 17, 2010, Mohamud responded: "[D]on't worry, brother, I will find you something inshallah.  Please do not e-mail this email any longer.  If someone replies from now on from this e-mail is not me, Remember that.  I hope we meet again soon inshallah."

On November 18, 2010, an excited Mohamud met with Youssef and Hussein for six hours.  They went to the storage unit Mohamud had rented, which he had selected in part because there were no surveillance cameras.  The three then drove to a hotel in Portland, where Mohamud showed the agents potential parking spots he had researched on his computer.  Next, they walked to Pioneer Courthouse Square to discuss the plan further.

During the November 18th meeting, Youssef asked: "What's a victory gonna be for you?"  Mohamud replied: "Try to get most, the most casualties."  Mohamud thought the bombing would get a lot of publicity because "America's boasting it so 'oh we haven't been attacked since 9/11.'"  Hussein asked Mohamud if he had any doubts about the bombing.  He did not.

On November 23, 2010, Mohamud and Hussein went to the storage unit to see the bomb parts.  Mohamud helped load purported bomb parts into Hussein's car, including barrels, wires, and nails. Mohamud also provided Hussein with items for their disguises to pose as water workers.

On November 25, 2010, Thanksgiving Day, Mohamud drove to Portland and spent the day with friends. His friends said he seemed "happy," although at dinner he became "reserved." They all went shopping at an outlet mall that night.

### I.   "Black Friday"—November 26, 2010

Early the next morning, on November 26th, Mohamud ran into a friend and told him that "I'm having the greatest morning of my life." Around noon, Youssef picked up Mohamud and they drove to a store to buy reflective vests as part of their disguises. Then they met up with Hussein in downtown Portland. Mohamud appeared "happy" and "excited."

The three drove about a mile to the parked van. When shown the "bomb" in the back of the van (which an FBI agent had constructed to look real but which was, in fact, inert), Mohamud said it was "beautiful." They returned to their hotel, ate, talked, and prayed. Shortly before 5:00 p.m., the three drove to the van. Youssef dropped off Mohamud and Hussein, then drove to a pre-arranged meeting location a few blocks west of Pioneer Courthouse Square.

Hussein and Mohamud drove the van to Pioneer Courthouse Square. Before exiting the van, Hussein told Mohamud to connect the wires for the detonator to work. Mohamud did so, and then they walked several blocks to join Youssef in his car. The three drove toward a train station, dropped off Youssef, and then Hussein and Mohamud parked a few blocks from the station.

Mohamud pulled out the cell phone and Hussein read him the number to dial to detonate the bomb. When Mohamud dialed the number and nothing happened, Hussein suggested that they step out of the car for better reception—the arrest signal. Mohamud was dialing the number into the cell phone a second time when FBI agents arrested them both. Hussein was shouting "Allahu Akbar! [God is great]" as he was being arrested. Mohamud was quiet initially, but during transport he began to kick and had to be restrained. Later, when speaking with the jail's psychiatric nurse, Mohamud cried and said he could not understand "how he had gotten from just being a student to being labeled a terrorist in jail."

Agents found an undated email printout from Al-Ali in Mohamud's wallet. A search of Mohamud's computer revealed videos of the 2007 and 2008 Portland Christmas Tree Lighting Ceremonies, as well as an al-Qaeda video, an audio file titled "No Peace with the Jews," and numerous references to the word "jihad." In a notebook found in his apartment, Mohamud had written: "Non Muslims are the eternal enemies of Islam and they must be subdued and humiliated." He also described the need to "mistrust" everyone and to act normal "to secure myself from the FBI."

## II. PROCEDURAL HISTORY

### A. Indictment and Trial

A one-count indictment charged Mohamud with attempted use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2)(A). After several years of pretrial litigation and review of immense discovery (including considerable litigation under the Classified Information Procedures Act, 18 U.S.C. app. 3), trial began in January

2013 and lasted thirteen days.  Both sides called numerous witnesses, and the cross-examinations were sharp and thorough.

There was no dispute that Mohamud had tried to blow up Pioneer Courthouse Square while it was filled with people. The spirited (and supportable) defense was entrapment—Mohamud, a teenager with no criminal record, had neither the means nor the intent to commit domestic terrorism until he became involved with the undercover FBI contractor (Bill Smith) and FBI agents (Youssef and Hussein).  The government countered that Mohamud's actions before any contact with the FBI—including his *Jihad Recollections* articles—as well as his readiness to commit such a horrific act of violence proved that he had the necessary predisposition to commit the crime.  After the close of evidence and argument, the jury returned a guilty verdict, rejecting the entrapment defense.

### B.  Post-Trial Motions

Mohamud challenged his conviction on numerous grounds.  He cited *Sherman v. United States*, 356 U.S. 369 (1958), to argue that the government had entrapped him as a matter of law.  Mohamud contended that he had intended to complete college in the United States, and only the FBI's aggressive and coercive actions had led him down the bombing path.  The district court rejected that argument, pointing to evidence that before any contact with the FBI, Mohamud: (1) originally planned to wage war in the United States until a dream refocused him on Yemen; (2) wrote articles for *Jihad Recollections* which advised how best to prepare to carry out "jihad" on non-believers; and (3) had lengthy email conversations with men that the FBI believed

promoted terrorism. The court also highlighted that Mohamud never showed any reluctance (unlike the defendant in *Sherman*), and only thirteen minutes after meeting Youssef in person, he said that he wanted to become "operational" by using a car bomb.

After the verdict (but before sentencing), the government filed a supplemental notice that it had "offered into evidence or otherwise used or disclosed in proceedings, including at trial" information derived from information collected pursuant to § 702 of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1881a (hereinafter referred to as "§ 702").[12] Mohamud argued that this late notice warranted suppression of this evidence (and any fruits thereof). The government countered that FISA did not provide for suppression in these circumstances, and in any case, there was no substantial prejudice, as the district court could conduct a post-trial suppression analysis. The district court agreed, finding no misconduct in the late disclosure, and that Mohamud had suffered no prejudice from the delayed disclosure.

Mohamud also argued that suppression was warranted because § 702 violates the First and Fourth Amendments, as well as the separation of powers doctrine.[13] As a threshold

---

[12] Section 702 was added to by the FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436, and was amended by the USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268.

[13] Here, Mohamud contended that U.S. Foreign Intelligence Surveillance Court ("FISC") review of targeting and minimization procedures under § 702 amounts to "providing a non-judicial advisory opinion" and authorizes a rule-making role for judges in violation of the non-delegation doctrine.

matter, the district court first held that § 702 did not "interfere[] with the prerogatives of another branch of government beyond requiring the executive branch to conform to the statute." It also reasoned that because the FISC either approves or denies the requested acquisition (and electronic communication service providers must follow the directives or challenge them), its opinions are not advisory. The court then explained that Mohamud had not raised an independent First Amendment claim, because motions to suppress based on First Amendment violations are analyzed under the Fourth Amendment.

Finally, the district court held that § 702 does not violate the Fourth Amendment. The court reasoned that § 702 surveillance does not trigger the Fourth Amendment's warrant requirement because U.S. persons' data is collected only incidentally, but even if it did, no warrant would be required because the foreign intelligence exception would apply.[14] The court then balanced the government's interests in the search against the intrusions on Mohamud's privacy, and held that the § 702 collection here was reasonable under the Fourth Amendment.

## C. Sentencing

The Sentencing Guidelines called for a life sentence. The government recommended a sentence of forty years' imprisonment, whereas Mohamud urged a sentence of ten years' imprisonment.

---

[14] The district court further held that subsequent querying of § 702-acquired data, without obtaining an additional search warrant, would also be constitutional, though it was "a very close question."

During the sentencing hearing, the district court acknowledged that, although the jury had rejected the entrapment defense, Youssef and Hussein "imperfect[ly]" entrapped Mohamud through their frequent praise and religious references, especially considering his youth. But the "horrific" nature of the intended crime, which would have resulted "in a great deal of death and mutilation," still warranted a sentence of thirty years' imprisonment.

## III.    DISCUSSION

### A.  Standard of Review

We review the district court's ruling on a motion for acquittal de novo. *See United States v. Sanchez*, 639 F.3d 1201, 1203 (9th Cir. 2011). When a defendant pursues an entrapment defense, we "should not disturb the jury's finding unless, viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that the defendant[] [was] predisposed to commit the charged offenses." *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994). We review the denial of a motion to dismiss based on a violation of constitutional rights de novo. *United States v. Brobst*, 558 F.3d 982, 994 (9th Cir. 2009).

We review de novo the denial of a motion to suppress evidence, but underlying factual findings are reviewed for clear error. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). We review for an abuse of discretion a district court's decision whether to use its supervisory powers—in this case, the supervisory power to decide whether to suppress evidence as a sanction for the government's late supplemental FISA notice. *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). Discovery

rulings and the denial of an evidentiary hearing are also reviewed for an abuse of discretion. *United States v. Mazzarella*, 784 F.3d 532, 537 (9th Cir. 2015).

We review de novo the constitutionality of a statute. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

## B.  Entrapment as a Matter of Law

As the district court stated at sentencing, the defense made a solid case for entrapment.  But the jury rejected that defense, and found Mohamud guilty despite the actions and encouragement of Youssef and Hussein and the communications (and attempted communications) from other government agents.  And in light of that verdict, Mohamud has a steep hill to climb.  "To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent." *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986); *see also United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008).

To avoid a finding of entrapment, the government must prove that: (1) Mohamud was predisposed to commit the crime before government agents contacted him, or (2) government agents did not induce him to commit the crime. *United States v. McClelland*, 72 F.3d 717, 722 (9th Cir. 1995).   We focus our inquiry on Mohamud's predisposition.

When evaluating predisposition, we often analyze five factors: (1) the character and reputation of the defendant;

(2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *Id*. "Although none of these factors is controlling, the defendant's reluctance to engage in the criminal activity is the most important." *Id*.

We can assume that factors (1), (3), and (5) are in Mohamud's favor. The second factor—whether the government made the initial suggestion of criminal activity— weighs against Mohamud. Although Youssef discussed with Mohamud five options of how to be a good Muslim, including the option to become "operational," Mohamud— not Youssef—made the initial suggestion to fill a car with explosives near a target location. Mohamud also told Youssef that he wanted to "wage war" within the United States before Youssef mentioned the possibility of an "operational" role. The government can rely upon Mohamud's statements to prove predisposition even though he made them after the initial contact by the government. *United States v. Tucker*, 133 F.3d 1208, 1217 (9th Cir. 1998).[15] Here, Mohamud discussed placing explosives in vehicles near target locations after the government's initial

---

[15] In *Tucker*, a jury convicted the defendant of extortion and filing false tax returns. This court affirmed his conviction and sentence, and rejected his argument that the evidence proved entrapment as a matter of law. This court considered statements made by the defendant even after the initial contact between the defendant and the government, noting that "[t]o prove the defendant's predisposition, the government can rely upon evidence occurring after the initial contact with a government agent." *Tucker*, 133 F.3d at 1217.

contact with him but before Youssef suggested criminal activity.    The second factor therefore weighs against Mohamud.

The fourth and "most important" factor also weighs overwhelmingly in the government's favor.  The government initiated its contact with Mohamud in November 2009 with the Bill Smith emails, and the more aggressive Youssef and Hussein operation began in June 2010.    Despite being provided numerous opportunities to deviate from or terminate the plan, Mohamud never displayed any reluctance in going through with a horrific attack that would have killed and maimed countless people, including young children.  Indeed, he expressed great enthusiasm in seeing it through.    He picked the target—the Pioneer Courthouse Square Christmas Tree Lighting Ceremony—and planned where the van containing the explosives would be parked.  He praised the terror attack in Mumbai, described the victims jumping from the Twin Towers on September 11th as "awesome," and stated that he would be "happy" to see the bodies of "enemies of Allah" torn apart.

The complete lack of reluctance on Mohamud's part to participate in the bombing—indeed, his immediate zeal to see it through—separates this case from those in which courts have found defendants entrapped as a matter of law.  For example, in *Jacobson v. United States*, 503 U.S. 540, 553 (1992), Jacobson was not predisposed in part because "[t]he evidence that [Jacobson] was ready and willing to commit the offense came only after the Government had devoted 2 ½ years to convincing him that he had or should have the right to engage in the very behavior proscribed by law."    In *Sherman*, a government informant approached the defendant, a recovering drug addict, and asked for narcotics, ostensibly

because the informant was not responding to treatment. 356 U.S. at 371. The defendant resisted—"[f]rom the first, [he] tried to avoid the issue." *Id.* Only "after a number of repetitions of the request, predicated on [the informant's] presumed suffering, did [the defendant] finally acquiesce." *Id*.; *see also id.* at 373 ("One request was not enough, for . . . additional ones were necessary to overcome, first, [the defendant's] refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation."). And in *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000), the government agent aggressively pushed the idea of sexual activities with children on an uninterested defendant until eventually he gave in:

> While Poehlman's reluctance might have been borne of caution . . . the fact remains that Poehlman's earliest messages (which would be most indicative of his pre-existing state of mind) provide no support for the government's case on predisposition. To the contrary, Poehlman's reluctance forced [the agent] to become more aggressive in her suggestions . . . .

*Id.* at 704; *see also id.* at 695–97. At least as to this factor, this case is more akin to *Williams*, in which we held that the defendant was not entrapped as a matter of law in part because "[t]here is no evidence that [the defendant] expressed any reluctance about the robbery that needed to be 'overcome by repeated government inducement or persuasion.' The evidence indicated that [he] was ready and willing at all times to participate in the robbery." 547 F.3d at 1198 (citation omitted).

Mohamud argues that his actions after the Bill Smith emails are irrelevant for entrapment purposes, as they were tainted by the government's overwhelming inducement. And with those post-Bill Smith actions set aside, the argument goes, there was insufficient evidence for the jury to conclude that he had the necessary predisposition to commit this crime. This is wrong for two reasons.

First, although "only those statements that indicate a state of mind untainted by the inducement are relevant to show predisposition," statements made after the inducement which make "clear that [Mohamud] would have committed the offense even without the inducement" are evidence of predisposition. *Poehlman*, 217 F.3d at 704–05. This would include Mohamud's statements that he made about the "awesome" terrorist attacks in Mumbai and on September 11th, and that he had been thinking about these "things" since he was fifteen years old. And a reasonable jury could infer that his decisions to become "operational" and blow something up the first time he met Youssef (and later, to choose Pioneer Courthouse Square at its most crowded time) were evidence that his predisposition existed long before FBI contractor Bill Smith emailed him.

Second, even if there were a rigid wall between pre- and post-inducement, there was sufficient evidence for a reasonable jury to reject the entrapment defense. Mohamud's *Jihad Recollections* articles—both the draft and final versions—provided ample evidence of his predisposition to carry out the charged crime. In those articles, he, among other things, coached people on how to prepare themselves physically to attack and kill their Western enemies, and saluted those in Afghanistan who "finish[ed] off" wounded American soldiers. Although these articles may come across

as a teenager trying to talk tough, they were enough to support the jury's finding, and for us to conclude that Mohamud was not the "otherwise innocent person" that the entrapment-as-a-matter-of-law doctrine requires. *Smith*, 802 F.2d at 1124; *cf. United States v. Cromitie*, 727 F.3d 194, 207–08 (2d Cir. 2013) (holding that the defendant in a similar case was not entrapped as a matter of law, and observing that "potential terrorists who are available to be recruited by Al Qaeda or similar groups" may not have necessarily already formed a specific plan, but "[t]heir predisposition is to have a state of mind that inclines them to inflict harm on the United States, be willing to die like a martyr, be receptive to a recruiter's presentation, . . . and welcome an invitation to participate").

In addition, the jury learned of Mohamud's correspondence with Al-Ali, which began months before the first contact from Bill Smith. The jury also learned of Mohamud's desire to go abroad and study at the Islamic school in Yemen that Al-Ali recommended to him. A government expert testified that this school was founded by a Muslim cleric who supported jihad and that it served as a "stepping stone" to violent jihad, especially for people from the West. As detailed above, the same day that Al-Ali told Mohamud about the school in Yemen, Mohamud apparently made plans to leave the United States. Though Mohamud ultimately remained in the country, the jury could have reasonably interpreted his attempt as evidence of a predisposition to commit the crime charged. Further, Mohamud continued to demonstrate interest in attending the school in his December 2009 emails to Al-Ali, which occurred after the Bill Smith emails.

In sum, viewing the evidence in the light most favorable to the government, we cannot say that "no reasonable jury could have concluded that [Mohamud was] predisposed to commit the charged offense[]." *Davis*, 36 F.3d at 1430. We therefore conclude that the district court properly rejected his defense of entrapment as a matter of law.

Mohamud's alternative argument that we should dismiss this case because the government overreached in its "sting" and violated due process also fails. While the government's conduct in this case was quite aggressive at times, it fell short of a due process violation.

In *United States v. Black*, we made clear that "[d]ismissing an indictment for outrageous government conduct . . . is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." 733 F.3d 294, 302 (9th Cir. 2013) (citation and internal quotation marks omitted). This is an "extremely high standard." *Id.*; *see also United States v. Pedrin*, 797 F.3d 792, 797 (9th Cir. 2015) ("[I]n assessing whether the government's conduct was 'outrageous,' the relevant question is what the government knew when it was setting up the sting, not what it learned later."). For example, we have denied challenges to sting operations involving armed robberies of phony drug stash houses which necessarily put law enforcement and the defendant in grave peril. *See Black*, 733 F.3d at 302; *Williams*, 547 F.3d at 1200–01. Mohamud argues that the six factors for evaluating outrageous

government conduct set out in *Black* favor dismissal of the indictment.[16] We disagree.

In *Cromitie*, a comparable Second Circuit case, the defendant was convicted of planning and attempting to carry out domestic terrorism offenses. 727 F.3d at 199–204. The defendant claimed that the government's conduct in persuading him to commit the charged offenses violated due process. *Id.* at 217. The Second Circuit held that it did not. Even though the government "invented all of the details of the scheme," the defendant's express desire to "do something to America" and "die like a martyr" was sufficient to justify the government's testing of how far he would go. *Id.* at 219. Like Mohamud, Cromitie argued that the government took advantage of his religious affiliation, but the court explained that a government agent "is entitled to probe the attitudes" of an individual who "volunteers that he wants to 'do something to America' . . . to learn whether his religious views have impelled him toward the violent brand of radical Islam that poses a dire threat to the United States." *Id.* at 219–20.

---

[16] These factors are analyzed collectively in determining whether government conduct is outrageous: "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." *Black*, 733 F.3d at 303. The first three are relevant to how the government set up the sting, the fourth and fifth analyze the government's role in the sting, and the last relates to the justification for the operation. *Id.* at 303–04.

Cromitie further claimed that the government had violated due process because a government informant had exploited his relationship with Cromitie to "manipulate Cromitie into agreeing to the planned attacks"; the court cited our precedent indicating that "the 'illusory cultivation of emotional intimacy' does not exceed due process limits." *Id.* at 220 (quoting *United States v. Simpson*, 813 F.2d 1462, 1467 (9th Cir. 1987)). Even considering certain monetary benefits offered by the government informant—including $250,000 cash, a barbershop valued at $70,000, a new BMW, and a two-week vacation—the court held that the overall operation did not rise to the level of a due process violation. *Id.* Although Mohamud may have been more vulnerable than Cromitie, the government's questionable actions in that case far exceeded anything here.

In light of the extremely high standard set out in *Black*, we hold that the government's conduct here did not violate due process.

## C.  Late Notice Of § 702-Derived Evidence

FISA requires the government to "notify the aggrieved person and the court" prior to trial when it intends to use at trial evidence "obtained or derived from electronic surveillance" pursuant to FISA. 50 U.S.C. § 1806(c); *see also* 50 U.S.C. § 1881e(a) (stating that information acquired under § 702 is subject to the notice requirement in § 1806(c)). The government provided a supplemental notice regarding evidence derived under § 702 after the trial concluded. Mohamud argues that this late disclosure mandates suppression, or at a minimum, discovery and an evidentiary hearing to explore the tardy disclosure.

In answering this question, we must keep two principles in mind. First, "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006); *see also Davis v. United States*, 564 U.S. 229, 237 (2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006) ("[T]he exclusionary rule is not a remedy we apply lightly."). Second, Congress has the power to authorize suppression for statutory violations, as it has done elsewhere in FISA. *See* 50 U.S.C. §§ 1806(g), 1825(h), 1845(g) (FISA); *see also* 18 U.S.C. § 2518(10)(a) (Title III wiretap). However, Congress has not mandated suppression as a remedy for late disclosure of a FISA notice, and, indeed, it apparently anticipated the possibility of post-trial notification. *See* 50 U.S.C. § 1806(e) (providing that a motion to suppress "unlawfully acquired" or nonconforming information "shall be made before the trial . . . unless . . . the person was not aware of the grounds of the motion"). These two principles strongly suggest that automatic suppression is not a required remedy for delayed FISA disclosure.

And in any case, Mohamud cannot demonstrate how the late disclosure prejudiced him. As the district court explained, it fully evaluated the § 702-derived evidence as if the motion had been brought before trial. This put Mohamud in the same position he would have been in if the government had provided timely notice.

Moreover, the district court found that the late disclosure was not due to "prosecutorial misconduct." Rather, the government had changed its legal opinion about when evidence could be considered "derived from" § 702 surveillance, performed another review of this case, and

provided the late supplemental notice on its own initiative. Our review of the unclassified and classified record supports that the district court did not clearly err in finding no prosecutorial misconduct.[17]

As the district court recognized, it had the power to suppress evidence, or even dismiss the indictment or grant a new trial, under its supervisory and statutory authority. *See Stinson*, 647 F.3d at 1210 (stating that a court may exercise its supervisory powers "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct" (citation omitted)); *see also* Fed. R. Crim. P. 16(d)(2). However, the district court determined that suppression as a sanction for the late supplemental FISA notice was not warranted here, and we agree.

We conclude that, under the circumstances of this case, the district court did not err in denying Mohamud's motion to suppress premised on the late supplemental FISA notice.[18]

---

[17] We do not reach whether suppression is necessary as a deterrent in light of the government's apparent self-correction of its practices. *See United States v. Dreyer*, 804 F.3d 1266, 1280 (9th Cir. 2015) (en banc).

[18] We also conclude that the district court did not abuse its discretion in denying discovery and an evidentiary hearing to explore the government's late disclosure. Mohamud's reliance on *United States v. Hernandez-Meza*, 720 F.3d 760, 769 (9th Cir. 2013), is misplaced because the record here does not "suggest[] that the government may have deliberately withheld" the supplemental FISA notice. Therefore, we decline Mohamud's alternative request to remand for further fact finding.

**D. Section 702 Collection of Mohamud's Email Communications**

**1. Legal Background**

In 1978, Congress enacted FISA "to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013) (citing 50 U.S.C. § 1801 *et seq.*). To do so, the government must obtain a FISA warrant from the FISC. *Id*. The FISA Court of Review assesses any denials by the FISC of applications for electronic surveillance. *Id*.

Thirty years later, Congress enacted § 702 as part of the FISA Amendments Act of 2008. 50 U.S.C. § 1881a. Section 702 "supplements pre-existing FISA authority by creating a new framework under which the Government may seek the FISC's authorization of certain foreign intelligence surveillance targeting the communications of non-U.S. persons located abroad." *Clapper*, 133 S. Ct. at 1144. "Unlike traditional FISA surveillance, § [702] does not require the Government to demonstrate probable cause that the target of the electronic surveillance is a foreign power or agent of a foreign power." *Id*. "And, unlike traditional FISA, § [702] does not require the Government to specify the nature and location of each of the particular facilities or places at which the electronic surveillance will occur." *Id*. Instead, § 702 mandates that the government obtain the FISC's "approval of 'targeting' procedures, 'minimization' procedures, and a governmental certification regarding proposed surveillance." *Id*. at 1145 (quoting 50 U.S.C. § 1881a(a), (c)(1), (i)(2), (i)(3)).

## 2.  No Fourth Amendment Violation

Although § 702 potentially raises complex statutory and constitutional issues, this case does not.  As explained below, the initial collection of Mohamud's email communications did not involve so-called "upstreaming" or targeting of Mohamud under § 702, more controversial methods of collecting information.[19]  It also did not involve the retention and querying of incidentally collected communications.  All this case involved was the targeting of a foreign national under § 702, through which Mohamud's email communications were incidentally collected.  Confined to the particular facts of this case, we hold that the § 702 acquisition of Mohamud's email communications did not violate the Fourth Amendment.[20]

At our request post-argument, the government declassified certain facts about Mohamud's surveillance.  Through the monitoring of a foreign national's email account,

_____

[19] Under "upstream" collection, entire streams of Internet traffic flowing across major U.S. networks are acquired and searched, as opposed to "PRISM" collection, under which particular user accounts are monitored, and communications to or from those accounts are collected, including communications with U.S. persons. *See, e.g.*, *Privacy & Civil Liberties Oversight Board ("PCLOB"), Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (July 2, 2014), at 7 (hereinafter "PCLOB Report"); *see also id*. at 33–41 (comparing PRISM and upstream collection).

[20] In light of our holding, we do not reach the question of whether the good faith exception to the exclusionary rule provides an independent basis to affirm the district court's denial of Mohamud's motion to suppress.  *See generally Davis*, 564 U.S. at 240–42; *Illinois v. Krull*, 480 U.S. 340, 349–55 (1987); *United States v. Leon*, 468 U.S. 897, 925 (1984).

the United States government learned that Mohamud was in contact with that foreign national, who was located overseas. This contact—a limited number of emails between Mohamud and the foreign national—was used to obtain a FISA warrant to surveil Mohamud and his activities. None of these emails was introduced at trial.[21]  We permitted the parties to file supplemental briefs to address the facts offered in the post-argument disclosure.

### a. No Warrant Required to Intercept Overseas Foreign National's Communications or to Intercept U.S. Person's Communications Incidentally

As a threshold matter, "the Fourth Amendment does not apply to searches and seizures by the United States against a non-resident alien in a foreign country." *United States v.*

---

[21] We address only Mohamud's as-applied challenge. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Though he also purports to challenge § 702 facially, citing *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015), Mohamud does not explain why techniques not employed in this case would require suppression of the evidence gathered here. We do not read *Patel* to permit courts, in a criminal prosecution, to suppress evidence based on a Fourth Amendment challenge to techniques not employed in a particular case. *See, e.g.*, *United States v. Posey*, 864 F.2d 1487, 1491 (9th Cir. 1989) ("[W]e think it clear that appellant may not make a facial challenge to the FISA without arguing that the particular surveillance *against him* violated the Fourth Amendment. . . . Even if he is correct that the FISA's language might be applied in ways that violate the Fourth Amendment, he must show that the particular search in his case violated the Fourth Amendment. Appellant cannot invalidate his own conviction on the argument that others' rights are threatened by FISA." (emphasis in original)).

*Zakharov*, 468 F.3d 1171, 1179 (9th Cir. 2006) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274–75 (1990)); *see also Verdugo-Urquidez*, 494 U.S. at 274–75 ("At the time of the search, [respondent] was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico. Under these circumstances, the Fourth Amendment has no application."). Thus, the government's monitoring of the overseas foreign national's email fell outside the Fourth Amendment.

Mohamud argues that under *Verdugo-Urquidez*, the location of the search matters, and that here, the searches took place in the United States.[22] Indeed, the government acknowledges that "collection from service providers under Section 702 takes place within the United States." Yet, as one court put it, "what matters here is the location of the *target*," and not where the government literally obtained the electronic data. *United States v. Hasbajrami*, No. 11-CR-623, 2016 WL 1029500, at *9 n.15 (E.D.N.Y. Mar. 8, 2016) (emphasis in original); *see also* Kris & Wilson, *National Security Investigations & Prosecutions* § 17:3 (2016) ("For non-U.S. person targets, there is no probable-cause requirement; the only thing that matters is [ ]the government's reasonable belief about[ ] the target's location.").

Consistent with *Verdugo-Urquidez* and our precedent, we hold that this particular type of non-upstream collection—

---

[22] Mohamud also argues that the targeted foreign national may have had sufficient "voluntary connection[s]" to the United States for the Fourth Amendment to apply. *See Verdugo-Urquidez*, 494 U.S. at 271, 273. We have reviewed the classified record, and are satisfied that is not the case here.

where a search was not directed at a U.S. person's communications, though some were incidentally swept up in it—does not require a warrant, because the search was targeted at a non-U.S. person with no Fourth Amendment right.

The FISA Review Court in *In re Directives Pursuant to Section 105B of FISA*, similarly applied this principle, holding that "incidental collections occurring as a result of constitutionally permissible acquisitions do not render those acquisitions unlawful." 551 F.3d 1004, 1015 (FISA Ct. Rev. 2008); *see also United States v. Donovan*, 429 U.S. 413, 436 n.24 (1977) (holding that a Title III wiretap warrant is not made unconstitutional by "failure to identify every individual who could be expected to be overheard," but "the complete absence of prior judicial authorization would make an intercept unlawful"); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y 2000) (explaining that "in the Title III context, incidental interception of a person's conversations during an otherwise lawful surveillance" does not violate the Fourth Amendment).

Mohamud and Amici[23] urge us not to apply this "incidental overhear" approach. First, Amici contend that surveillance of U.S. persons' communications under § 702 is not "incidental" because the monitoring of communications between foreign targets and U.S. persons was specifically contemplated and to some degree desired. We agree that such communications were anticipated. As the Privacy and Civil Liberties Oversight Board found with respect to PRISM collection, "[t]he collection of communications to and from

---

[23] Amici are the American Civil Liberties Union, American Civil Liberties Union of Oregon, and the Electronic Frontier Foundation.

a target inevitably returns communications in which non-targets are on the other end, some of whom will be U.S. persons. Such 'incidental' collection of communications is not accidental, nor is it inadvertent." PCLOB Report at 82; *see also* Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117, 159–64, 259–62 (2015) (discussing the relative volume and intrusiveness of surveillance authorized under § 702). The fact that the government knew some U.S. persons' communications would be swept up during foreign intelligence gathering does not make such collection any more unlawful in this context than in the Title III or traditional FISA context.

Mohamud and Amici also contend that the "sheer amount of 'incidental' collection" separates § 702 from prior cases where courts have found such collection permissible. We agree with the district court's observation that the most troubling aspect of this "incidental" collection is not whether such collection was anticipated, but rather its volume, which is vast, not *de minimis*. *See* PCLOB Report at 114 ("The term 'incidental' is appropriate because such collection is not accidental or inadvertent, but rather is an anticipated collateral result of monitoring an overseas target. But the term should not be understood to suggest that such collection is infrequent or that it is an inconsequential part of the Section 702 program."). This quantity distinguishes § 702 collection from Title III and traditional FISA interceptions. However, the mere fact that more communications are being collected incidentally does not make it unconstitutional to apply the same approach to § 702 collection, though it does

increase the importance of minimization procedures once the communications are collected.[24]

Additionally, Mohamud and Amici contend that prior cases upholding incidental collection involved prior judicial review or a "narrowly drawn exception to the warrant requirement," as opposed to the collection here. *See, e.g.*, *United States v. Kahn*, 415 U.S. 143, 156–57 (1974) (upholding interception of communications of a woman that were incidentally collected under a wiretap order targeting her husband); *United States v. Figueroa*, 757 F.2d 466, 473–75 (2d Cir. 1985) (holding that wiretap order was not made unconstitutional by permitting interception of conversations of "others as yet unknown"); *see also United States v. Martin*, 599 F.2d 880, 884–85 (9th Cir. 1979) (holding that the Fourth Amendment does not require wiretap application to show probable cause that non-targeted individual named as a "probable converser" committed a crime), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) (en banc). However, the searches in those cases targeted United States citizens and took place within the United States, so a warrant was required for the initial search to be constitutionally permissible. But "the guiding principle behind them applies with equal force here: when surveillance is lawful in the first place—whether it is the domestic surveillance of U.S. persons pursuant to a warrant, or the warrantless surveillance of non-U.S. persons who are abroad—the incidental interception of non-targeted U.S. persons' communications with the targeted persons is also lawful." *Hasbajrami*, 2016 WL 1029500, at *9.

---

[24] To the extent that Amici argue that the incidental overhear doctrine permits the unconstitutional and widespread retention and querying of the incidentally collected information, that issue is not before us.

For these reasons, and because the target of the surveillance was a non-U.S. person located outside of the United States at the time of the surveillance, the government was not required to obtain a search warrant to collect Mohamud's email communications with the overseas foreign national as an incident to its lawful search of the foreign national's email.[25]

### b. Collection of Mohamud's Emails was Reasonable

Assuming that Mohamud had a Fourth Amendment right in the incidentally collected communications, the search at issue was reasonable under the Fourth Amendment.[26]

"Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution." *Maryland v. King*, 133 S.

---

[25] Because the incidental collection excepts this search from the Fourth Amendment's warrant requirement, we need not address any "foreign intelligence exception."

[26] It is unclear whether Mohamud had a right to bar use of these incidentally-collected communications in evidence against him on the basis that the communications were seized in violation of the Fourth Amendment. Commentators suggest that he does, so we will assume that here. *See, e.g.*, Orin S. Kerr, *The Fourth Amendment and the Global Internet*, 67 Stan. L. Rev. 285, 313–14 (2015) ("Communicating with a person who lacks Fourth Amendment rights should not waive the rights of the person who has those rights. The Fourth Amendment should continue to fully protect the U.S. person who communicates with those lacking Fourth Amendment rights."); PCLOB Report at 94 ("The government has acknowledged that the Fourth Amendment rights of U.S. persons are affected when their communications are acquired under Section 702 incidentally or otherwise[.]").

Ct. 1958, 1970 (2013).   In deciding reasonableness, we examine the totality of the circumstances and weigh "'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'" *Id*. (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).  We agree with the district court that under these circumstances, the search was reasonable under the Fourth Amendment.

### i.   Government Interest

"[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).  Neither Mohamud nor Amici challenge this.  Instead, they argue that (1) the statutory definition of "foreign intelligence information" in § 702 is overbroad because it is not confined to national security information but also includes "the conduct of [] foreign affairs"[27]; and (2) even if national security justifies the initial acquisition, it is unreasonable to then retain and later search U.S. persons' § 702-acquired communications without a warrant.

The declassified facts foreclose both arguments.  First, as the district court observed, "the discovery in this case all concerned protecting the country from a terrorist threat and did not stray into the broader category of the conduct of foreign affairs."  Thus, we need not determine whether the collection of foreign affairs communications is reasonable. Similarly, the second argument is also outside the scope of our review, as no such retention and querying is at issue in this case.

---

[27] *See* 50 U.S.C. §§ 1801(e)(2)(b), 1881(a).

### ii.  Mohamud's Privacy Interest

The parties agree that Mohamud had some expectation of privacy in his electronic communications, but disagree as to the strength of his interest.  The government argues that U.S. persons have a limited expectation of privacy when communicating electronically with non-U.S. persons located outside the United States because of the Fourth Amendment's "third-party" doctrine—that a person's privacy interest is diminished where he or she reveals information to a third party, even in confidence.  Mohamud contends that the voluntary disclosure of information to third parties does not reduce the expectation of privacy.  The district court determined that under the third-party doctrine, Mohamud had a reduced expectation of privacy in his communications to third parties.  We agree.

With respect to a U.S. person's privacy interest, we treat emails as letters.  *See, e.g.*, *[Redacted]*, 2011 WL 10945618, at *26 (FISA Ct. Oct. 3, 2011) ("Whether they are transmitted by letter, telephone or e-mail, a person's private communications are akin to personal papers."); *United States v. Warshak*, 631 F.3d 266, 285–86 (6th Cir. 2010) ("Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection."). Accordingly, until electronic communications reach the recipient, they retain the same level of privacy interest as if they were still in the home.  *See, e.g.*, *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970).

But as with letters, "[a] person's reasonable expectation of privacy may be diminished in 'transmissions over the Internet or e-mail that have already arrived at the recipient.'"

*United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007) (quoting *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (citing *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001))); *see also Guest*, 255 F.3d at 333 ("[Users] would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose 'expectation of privacy ordinarily terminates upon delivery' of the letter." (citation omitted)).

It is true that prior case law contemplates a diminished expectation of privacy due to the risk that the recipient will reveal the communication, not that the government will be monitoring the communication unbeknownst to the third party. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 443 (1976); *United States v. White*, 401 U.S. 745, 752 (1971); *Hoffa v. United States*, 385 U.S. 293, 302 (1966). While these cases do not address the question of government interception, the communications at issue here had been sent to a third party, which reduces Mohamud's privacy interest at least somewhat, if perhaps not as much as if the foreign national had turned them over to the government voluntarily. *See also Hasbajrami*, 2016 WL 1029500 at \*11 & n.18 (observing same distinction).

Thus, Mohamud's interest in the privacy of his communications received by the overseas foreign national is diminished.

### iii.  Privacy Protecting Measures

An important component of the reasonableness inquiry is whether the FISC-approved targeting and minimization measures sufficiently protect the privacy interests of U.S.

persons. Targeting and minimization procedures govern, respectively, who may be targeted for surveillance and how intercepted communications are to be retained and disseminated.

In brief, targeting procedures must be "reasonably designed" to "ensure that any acquisition authorized under [the certification] is limited to targeting persons reasonably believed to be located outside the United States" and to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." 50 U.S.C. § 1881a(d)(1). Among other requirements, minimization procedures must be "reasonably designed" "to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information." 50 U.S.C. §§ 1801(h)(1), 1881a(e)(1).

After evaluating the protections detailed in § 702 and the classified minimization procedures, the district court concluded that as applied to Mohamud, § 702 is reasonable under the Fourth Amendment. Based on our review of the classified record, we agree that the applicable targeting and minimization procedures, which were followed in practice, sufficiently protected Mohamud's privacy interest.

The government also contends that certain oversight procedures provide an important check on Executive Branch actions. For example, § 702 requires the Attorney General ("AG") and Director of National Intelligence ("DNI") to certify, among other things, that (1) a significant purpose of

the acquisition is to obtain foreign intelligence information, (2) they have adopted guidelines to ensure compliance with the statutory limitations in § 702(b), and (3) the targeting and minimization procedures and guidelines are consistent with the Fourth Amendment. 50 U.S.C § 1881a(g)(2)(A); *see also id*. § 1881a(g)(1)(B) (providing that if the AG and DNI determine that "time does not permit the submission of a certification under this subsection prior to the implementation of an authorization under subsection (a)" they shall submit the certification "as soon as practicable but in no event later than 7 days after such determination is made"). Further, the AG and DNI must periodically assess whether the government is complying with FISC-approved targeting and minimization procedures and guidelines, which adds further oversight and privacy protections. *See* 50 U.S.C. § 1881a(i).

While Executive Branch certification contributes some degree of further protection, it does not weigh heavily. Typically in the Fourth Amendment context, review from a neutral magistrate is considered the appropriate check on the Executive, which otherwise may be motivated by its interest in carrying out its duties. *See, e.g.*, *Leon*, 468 U.S. at 913–14 (explaining that in obtaining a search warrant, a neutral magistrate is "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime'" (citation omitted)). Under these circumstances, where the only judicial review comes in the form of the FISC reviewing the adequacy of procedures, this type of internal oversight does not provide a robust safeguard. The government notes that in *In re Sealed Case*, 310 F.3d 717, 739 (FISA Ct. Rev. 2002), the FISA Review Court observed that Congress recognized that certification by the AG in the traditional FISA context would "'assure [ ] written

accountability within the Executive Branch' and provide 'an internal check on Executive Branch arbitrariness.'" (citation omitted). However, as described above, § 702 differs in important ways from traditional FISA, and a mechanism that might provide additional protections above and beyond those already employed in a traditional FISA context provides far less assurance and accountability in the § 702 context, which lacks those baseline protections. *See also Clapper*, 133 S. Ct. at 1144–45.

Accordingly, although we do not place great weight on the oversight procedures, under the totality of the circumstances, we conclude that the applied targeting and minimization procedures adequately protected Mohamud's diminished privacy interest, in light of the government's compelling interest in national security.

In sum, even assuming Mohamud had a Fourth Amendment right in the incidentally collected communications, the search was reasonable. Thus, we hold that the application of § 702 did not violate the Fourth Amendment under the particular facts of this case.[28]

---

[28] We also agree with the district court that the FISC survives separation of powers and non-delegation challenges, as FISC review of § 702 surveillance applications does not "interfere[] with the prerogatives of another branch of government beyond requiring the executive branch to conform to the statute," and is "central to the mission of the judiciary" as it is similar to "the review of search warrants and wiretap applications." *See Mistretta v. United States*, 488 U.S. 361, 388 (1989). Further, we agree with the district court that FISC opinions are not advisory because the FISC either approves or denies the requested acquisition (and electronic communication service providers must follow the directives or challenge them). *See* 50 U.S.C. § 1881a(h), (i)(2). Finally, the district court correctly rejected Mohamud's First Amendment challenge, as motions to suppress based on First Amendment violations are analyzed

## IV.     CONCLUSION

Many young people think and say alarming things that they later disavow, and we will never know if Mohamud—a young man with promise—would have carried out a mass attack absent the FBI's involvement.  But some "promising" young people—Charles Whitman, Timothy McVeigh, and James Holmes, to name a few from a tragically long list—take the next step, leading to horrific consequences. While technology makes it easier to capture the thoughts of these individuals, it also makes it easier for them to commit terrible crimes.   Here, the evidence supported the jury's verdict, and the government's surveillance, investigation, and prosecution of Mohamud were consistent with constitutional and statutory requirements.

**AFFIRMED.**

---

under the Fourth Amendment.  *See, e.g.*, *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007) (where a party alleges that a criminal investigation violated the First Amendment rights of a third party, "we have held that the *Fourth Amendment* provides the relevant benchmark" (emphasis in original)); *United States v. Aguilar*, 883 F.2d 662, 697 (9th Cir. 1989).